**UNITED STATES of America**

v.

**CONTINENTAL GROUP, INC., Chase Bag Company, James K. Cooper and Harrison B. Rue.**

**Crim. No. 76–514.**

United States District Court,
E. D. Pennsylvania.

July 20, 1978.

Walter L. Devany, Morton M. Fine, Donald C. Klawiter, James A. Backstrom, Jr., Trial Attys., Antitrust Div., Philadelphia, Pa., for United States.

Larry L. Williams, Washington, D. C., Patrick T. Ryan, Henry T. Reath, H. Francis Delone, Robert W. Sayre, Philadelphia, Pa., for defendants.

## MEMORANDUM AND ORDER

BECHTLE, District Judge.

### INTRODUCTION

On October 29, 1976, Continental Group, Inc. ("Continental"), American Bag & Paper Corporation ("American"), Chase Bag Company ("Chase"), Harley Corporation ("Harley"), St. Regis Paper Company ("St. Regis"), James K. Cooper ("Cooper"), David Mawicke ("Mawicke"), Peter J. Weggeman ("Weggeman"), Stanley A. Schottland ("Schottland"), Harrison B. Rue ("Rue"), William H. Versfelt ("Versfelt") and Edward W. Weikum ("Weikum") were charged in a one-count indictment with having engaged, together with several unindicted coconspirators,[1] in a continuing combination and conspiracy in unreasonable restraint of interstate trade and commerce, in violation of Section 1 of the Act of Congress of July 2, 1890, *as amended*, 15 U.S.C. § 1 ("Sherman Act"). The indictment charged that the combination and conspiracy consisted of a continuing agreement, understanding and concert of action among the defendants and coconspirators, the substantial terms of which .were to raise, fix, maintain and stabilize the prices and the terms and conditions for the sale of consumer bags. Consumer bags were defined in the indictment as follows:

> Consumer bags, also known in the trade as "small bags," are made from one or more plies of paper and may be combined with other materials used as linings

---

1. The Government's Voluntary Bill of Particulars named 10 corporations and 35 individuals as unindicted coconspirators. This list was amended by the Government's First Supplemental Voluntary Bill of Particulars to name a total of 10 corporations and 41 individuals as unindicted coconspirators.

and/or coatings. Consumer bags are preformed by the manufacturer in many styles and sizes according to customer specifications. Most consumer bags have printed exterior designs as specified by the customer. Consumer bags are designed for capacities of less than twenty-five pounds. They are normally used to pre-package products which are then marketed in such bags.

· Consumer bags are used for packaging a variety of products including, among others, pet foods, cookies, tea, coffee, kitty litter, chemicals, and agricultural products. Consumer bags also include air-sickness bags.

The conspiracy and combination with which the defendants were charged was alleged in the indictment to have begun as early as 1950 and to have continued until the date of the return of the indictment on October 29, 1976.

Pleas of *nolo contendere* were entered by Harley on December 10, 1976, and by Schottland and American on June 1, 1977. The trial of the remaining defendants commenced September 30, 1977, before this Court and a jury. At the close of the Government's case, the motions of Mawicke and Versfelt for a judgment of acquittal, pursuant to Fed.R.Crim.P. 29(a), were granted by the Court. At the close of the entire case, the jury on November 23, 1977, returned a verdict of guilty as to Continental, Chase, Cooper and Rue, and a verdict of not guilty as to St. Regis, Weggeman and Weikum.

The total proceedings in this case, including five days of *voir dire*, the jury's deliberations and the return of the jury's verdict, lasted 43 days—from September 26 to November 23, 1977. From the date the indictment was returned and until the jury rendered its verdict, approximately 140 written motions · were filed with the Court by the defendants. During the course of the trial, in which 4 Government counsel, 21 defense counsel and numerous assistants and paralegals participated, 14 witnesses were called by the Government and a total of 30 witnesses were called by the defense. The combined total of demonstrative exhibits (charts, graphs, documents) introduced at trial numbered in excess of 5,000. Subsequent to the jury's verdict, the four convicted defendants filed post-trial motions with the Court which totaled in excess of 300 pages.

Presently before the Court are the motions of defendants Continental, Chase, Cooper and Rüe for judgment of acquittal or, in the alternative, for a new trial or for an arrest of judgment, pursuant to Fed.R. Crim.P. 29(c), 33 and 34, respectively. For the reasons stated below, each of these motions will be denied.

## SUMMARY OF THE EVIDENCE

A brief summary of the evidence, construed in a light most favorable to the Government, will facilitate an understanding of this Opinion.

Beginning in 1950 or 1951, representatives of the major consumer bag manufacturers in the United States attended meetings at which they discussed the prices to be charged for consumer bags. At these early meetings, the competitors represented included the Benjamin C. Betner Company ("Betner"), the Thomas M. Royal Company ("Royal"), Union Bag and Paper Company ("Union Bag"), American, Arkell and Smith ("Arkell") and Oneida Packaging Products, Inc. ("Oneida"). In 1953, Continental acquired Betner and, in 1967, Chase acquired Arkell. Harley entered the consumer bag industry in the early 1960's, and St. Regis entered the consumer bag portion of the paper industry in 1965. Subsequent to their respective entries into the consumer bag industry, representatives of Continental, Chase, Harley, American and St. Regis regularly attended meetings of competitors. Thus, by 1967, and continuing until the return of the indictment, the core of the group of manufacturers of consumer bags whose representatives regularly attended meetings of competitors consisted of Continental, Chase, American, Harley and St. Regis.

The first of these meetings about which there was detailed testimony at trial was

held at the Arkell headquarters in New York in 1960 or 1961. This meeting was attended by price analysts from Continental, Arkell and the Bemis Bag Company ("Bemis"), who had been instructed by their respective superiors to devise a new list-price format for consumer bags which would be used by Continental, Arkell, American, Bemis and Oneida to price orders from customers for consumer bags [N.T. 9–182 to 9–189, 12–44 to 12–49]. The consumer bag list-price format created at this meeting was a looseleaf binder which contained lists and/or tables of all the possible variable components or factors ("factors") involved in the manufacture of a consumer bag, such as type or plies of paper, printing process or manufacturing charges, and a corresponding price for each factor. Consumer bags are generally manufactured according to customer specifications and, thus, the factors involved in the construction of a particular consumer bag vary according to the particular specifications. Therefore, the price format devised at this meeting not only provided manufacturers with corresponding prices for most of the factors specified by a customer, but also allowed any manufacturer constructing consumer bags according to a particular set of customer specifications to arrive at the identical total price simply by adding the prices for the factors involved in that particular bag.[2]

Continental, Arkell and American each adopted and employed the list-price format devised at the Arkell headquarters meeting [N.T. 9–188 to 9–189, 12–44 to 12–49], as did Chase, Harley and St. Regis subsequent to their respective entries into the consumer bag industry; and all continued to employ the list-price format throughout the period of the indictment. After the implementation of the list-price format, manufacturers entering the consumer bag industry, and existing manufacturers who did not adopt and follow the format, would be invited to attend a meeting of representatives of consumer bag manufacturers. At these meetings, representatives from Continental,

American, and later Harley, would advise these competitors that they were selling below the "market price," that they could make a profit without deviating from the list price and that "the other" manufacturers wanted them to price consumer bags from the list-price book and not deviate from it [N.T. 3–9 to 3–19, 3–120 to 3–126].

Approximately twice a year during the period covered by the indictment, general or across-the-board increases, wherein each factor contained in the price book would be increased by a certain percentage, were implemented. And from time to time, selective or single-factor increases, whereby the price for only one component or factor, such as paper, would be increased, were also implemented. The general procedure for implementing these general or selective price increases was for Continental to announce the previously agreed upon price increase in the Wall Street Journal and then to distribute revised price sheets to Chase, St. Regis, American, Harley and other competitors pricing from the list-price format [N.T. 6–106 to 6–122, 7–102 to 7–108, 14–59 to 14–63, 14–75].

The amount and effective date of the implementation of the general or selective price increases were agreed to by representatives of Continental, Chase, American, Harley and St. Regis at the regular meetings of the representatives of these competitors. During the period from the early 1960's to May, 1971, these meetings of the representatives of the major competitors in the consumer bag industry were held at various country clubs around the country. At these meetings, the representatives discussed various problems of the industry and also discussed and agreed to the prices and the terms and conditions for the sale of consumer bags. For example, in 1962, representatives from Arkell and Continental met at the home of Eugene Pavitt ("Pavitt"), Executive Vice-President of American, to persuade Pavitt to agree to a proposed increase in the cost of heat-sealed

---

2. For a detailed explanation of the method of employing the list-price book to compute the price of a consumer bag, see testimony of Kathryn M. Sloan, N.T. 6–126 to 6–200.

consumer bags [N.T. 7–188 to 7–192, 12–79 to 12–92]. And in the summer or fall of 1969, Cooper and George Landon ("Landon") of Continental, and Frederick Kiendl ("Kiendl") and Eugene Alexander ("Alexander") of Chase met with representatives of St. Regis, American and Harley at the Philmont Country Club near Philadelphia to discuss a 3% general price increase which had been announced by Continental prior to the meeting. In addition to comments about the adequacy of the proposed increase, the representatives at that meeting discussed the fact that price increase announcements were not usually made without the others knowing about the increases first [N.T. 8–159 to 8–162, 7–200 to 7–211]. Again, at a meeting held January 16, 1970, at Hilton Head Island, South Carolina, the amount and effective date of a general price increase were proposed, discussed and agreed to by Landon of Continental, Alexander of Chase and representatives from St. Regis, American and Harley [N.T. 3–59, 3–84, 8–166]. Finally, at a meeting held at the Tamarack Country Club in Greenwich, Connecticut, on September 29, 1970, which was attended by Cooper and Landon of Continental, Alexander and Kiendl of Chase and representatives from St. Regis, Harley and American, Pavitt proposed that a factor for rotogravure printing charges be included in the price book [N.T. 7–238, 8–171 to 8–172, 8–180]. At this meeting, a 3% general price increase on certain types of bags was also discussed [N.T. 8–172 to 8–174], and in addition, Landon suggested that representatives from American revise the air-sickness bag list price [N.T. 8–176 to 8–179].

On May 27, 1971, a meeting was held at the Darien Country Club in Connecticut which was attended by Cooper and Landon of Continental, Alexander, Kiendl and James Wells ("Wells") of Chase and representatives of St. Regis, American and Harley. Shortly after the meeting began, Robert Searle ("Searle") of St. Regis announced to the group that he had consulted with legal counsel, that in his opinion the meetings had gotten completely out of hand, because they were discussing prices and other issues they had no business discussing, and that representatives from St. Regis would no longer attend the meetings unless they were held under the auspices of an organized trade association [N.T. 3–87, 3–91 to 3–93, 7–243, 8–191 to 8–194, 10–148 to 10–153]. Schottland and Harley both objected to the group joining a trade association, because they feared that confidential price information would be disclosed to "outside" competitors, and suggested that the group form its own trade association. Those present finally agreed that the group would join the Paper Sack Shipping Manufacturers' Association ("PSSMA"), but that prices would only be discussed at private, informal meetings attended by representatives of the involved competitors [N.T. 10–152 to 10–153]. Continental, American and Chase joined the PSSMA shortly thereafter; Harley and St. Regis were already members [N.T. 3–91].

The first PSSMA meeting attended by representatives from Continental, Chase, American, St. Regis and Harley was held October 6 to 9, 1971, in Scottsdale, Arizona. The general procedure followed at the post-PSSMA gatherings of representatives was for the group to attend the formal sessions of the PSSMA, at which legal counsel was present, and also to attend prearranged, informal sessions at which legal counsel was not present and which were attended primarily by representatives of Continental, Chase, American, Harley and St. Regis; although occasionally representatives from Bemis or Union Camp would also attend. These informal meetings were usually held in a representative's suite or a private dining or meeting area. At these meetings, the group continued to propose, discuss and agree upon price increases or changes in the terms and conditions for the sale of consumer bags. For example, at an informal meeting held during the PSSMA convention in New Orleans, Louisiana, in April of 1974, Robert A. Harley ("Robert Harley"), Chairman of the Board of Harley, asked the group of representatives in attendance to consider adding a factor for pallet and finishing charges to the price list. Robert

Harley testified that he felt that the representatives who were present, who included Cooper of Continental, Kiendl and Rue of Chase and representatives from St. Regis, Harley and American, did not support the proposal at the time but that all of the competitors except American did later add a factor for pallet charges to the price list [N.T. 3–153 to 3–157, 10–205 to 10–207, 18–84 to 18–90]. And at an informal meeting held during the PSSMA convention in Williamsburg, Virginia, from September 22 to 25, 1974, which was attended by Cooper of Continental, Rue and Kiendl of Chase and representatives from St. Regis, American and Harley, Cooper proposed, and Rue discussed, the implementation by the members of the group of the "LIFO" method of accounting [N.T. 11–43 to 11–47, 15–67 to 15–69].

During this post-PSSMA period, three problems of concern to the entire group of representatives developed which, in addition to the prices and the terms and conditions for the sale of consumer bags, were discussed at these meetings. First, Schottland, who became President and Chief Executive Officer of American in 1969, decided that American was going to undertake a more competitive position in the market place by quoting prices based upon an independent cost analysis and by adopting new marketing methods, such as discounting on long-term contracts [N.T. 8–91]. After making this decision, Schottland would apparently advise representatives of American's competitors that he would follow the agreed upon price increases but would then delay in implementing those increases with his larger customers. Representatives of American's competitors were angered by Schottland's conduct, and confrontations between Schottland and representatives of these competitors began to occur. For example, at an informal dinner meeting at Antoine's Restaurant held during the April 3 to 5, 1974, PSSMA convention in New Orleans, which was attended by Cooper of Continental, Rue and Kiendl of Chase and representatives from St. Regis, American and Harley, Kiendl and Rue made derogatory comments to Schottland about Schott-

land's "dragging his feet" on price increase announcements and about Schottland's pattern of agreeing to implement price increases and then delaying [N.T. 3–162, 15–36 to 15–37]. And again, at an informal dinner meeting held at Henrici's Restaurant during the June 26 to 28, 1974, PSSMA convention in Chicago, which was attended by Cooper of Continental, Rue of Chase and representatives of St. Regis, American and Harley, an argument developed between Rue and Schottland about Schottland's "dragging his feet" on price increases and giving "price protection" to his larger accounts [N.T. 3–191 to 3–195, 14–101 to 14–106, 11–21 to 11–36, 15–51 to 15–53, 15–88 to 15–89]. In response to Rue's comments, Schottland advised Rue that he was going to run his own company. Then, turning to Robert Harley, Schottland said that he was also tired of receiving threatening phone calls [N.T. 3–192]. Schottland was also accused by Kiendl of Chase, during an informal dinner meeting held during the January 8 to 10, 1975, PSSMA convention at Marcos Island, Florida, which was attended by Cooper and other representatives of Continental, Kiendl of Chase, and representatives of American, Harley and St. Regis, of "dragging his feet" on price increases [N.T. 11–56 to 11–58, 15–69 to 15–71].

Finally, prior to the PSSMA convention in Hamilton, Bermuda, held September 28 to October 1, 1975, Cooper called Robert Harley to tell him that Schottland was again "dragging his feet" on price increases and that he wanted Harley to join him at a meeting with Schottland "to see if [they] couldn't get [Schottland] to refrain from doing this" [N.T. 3–200 to 3–204]. Robert Harley told Cooper during that phone call that he was considering not following the price increase unless Schottland did [N.T. 3–204]. At the Bermuda meeting, Cooper invited Schottland to a breakfast meeting, which was also attended by Robert Harley and representatives from American. At that meeting, Cooper advised Schottland that a general price increase had been proposed and that "the others" had agreed to

go along with the increase, but that they wanted to know what Schottland proposed to do [N.T. 3–204 to 3–207, 11–63 to 11–65, 14–152 to 14–159]. Schottland said that he "would go along" with the price increase and Robert Harley said that, since Schottland had agreed, he, too, would go along with the price increase. *Id.*

The second problem which developed was that, in the late 1960's or early 1970's, Rose Loughrey ("Loughrey"), a price analyst with Continental, became dissatisfied with her employment at Continental, because she felt she was the victim of sex discrimination and also because she was disturbed by the "collusion" among the competitors. In the course of discussing these problems with Landon and her other superiors at Continental, Loughrey threatened to inform someone at the United States Department of Justice about the continuing price-fixing meetings and agreements among the representatives of the competing manufacturers. On at least three occasions, at informal meetings held during the PSSMA conventions in Atlanta, Georgia, in April, 1973; Hamilton, Bermuda, in late September, 1975; and, the City Line Marriott in Philadelphia in October, 1975, either Landon or Cooper of Continental briefed a group consisting variously of Rue and Kiendl of Chase and representatives from St. Regis, Harley and American, on the current status of the "Rose Loughrey situation" [N.T. 3–127 to 3–133, 8–27 to 8–33, 11–60 to 11–62, 14–154, 14–161 to 14–163].

The final problem was St. Regis' announcement that they were no longer going to follow the Continental list price but were going to formulate their own list price, particularly for the purpose of pricing pet food bags. At private, informal meetings held during the PSSMA conventions in New Orleans in April, 1974, and Chicago in June, 1974, attended by Cooper of Continental, Rue and Kiendl of Chase and representatives from St. Regis, American, Harley and Bemis, St. Regis' proposal was discussed [N.T. 10–208 to 10–209, 14–104 to 14–106, 15–55 to 15–60]. At a prior meeting held during the Pebble Beach PSSMA meeting in October, 1973, Landon of Continental had announced to the group that Continental was the "price leader" and would publish the price book and other factor information [N.T. 10–201, 15–24]. At the June, 1974, PSSMA meeting in Chicago, in response to St. Regis' announcement that it was going to issue a new pet food price list, Cooper of Continental responded, "Go ahead—do it—be my guest" [N.T. 10–209]. Most of the group, however, responded favorably to St. Regis' proposal, and Robert Harley advised St. Regis that he would follow their list when they published it [N.T. 10–209, 14–104 to 14–106, 15–55 to 15–60]. St. Regis issued their new price list December 30, 1974; and all of the other major competitors, including Continental and Chase, followed St. Regis' format and adopted it as the industry list [N.T. 7–76 to 7–77, 9–139 to 9–211, 10–211, 14–27 to 14–28, 14–55 to 14–57]. However, by the time of the next price increase, Continental had again established itself as the price leader and issued new price lists which, *inter alia*, reflected St. Regis' format.

In addition to discussions and agreements about the prices and the terms and conditions for the sale of consumer bags among representatives of Continental, Chase, St. Regis, Harley and American, at meetings held from 1950 through October of 1976, representatives from all of these companies also discussed and agreed upon the prices and the terms and conditions for the sale of consumer bags over the telephone. These calls, alternately referred to as "monitoring" or "verifying" calls, were made for the purpose of either obtaining a list price "multiplying factor" for a component not included on the list or to ensure that Continental and its competitors were quoting identical prices to their customers for bags with similar specifications [N.T. 3–64, 4–86, 4–103, 6–167, 12–141 to 12–147, 15–94 to 15–115]. For example, Loughrey testified that, from approximately 1961 to 1970, when Continental received a request for a price on a particular bag, Continental representatives would call all of the competitors who made that particular type of bag, *e. g.*, heat-sealed, to ask if they had received a

similar inquiry and, if so, what price they were going to quote to the customer [N.T. 12–40 to 12–43]. Loughrey also testified that she was advised by her superiors at Continental to accept "verification" calls from particular representatives at American, Arkell, St. Regis, Harley and Bemis, and that she was introduced individually to these representatives by telephone [N.T. 12–96 to 12–112]. Loughrey also testified that she was authorized to receive "verification" calls from representatives at Chase after Chase acquired Arkell [Id.]. Cooper and other Continental representatives engaged in these "verification" calls with representatives of Harley [N.T. 2–213, 3–61 to 3–62, 3–68 to 3–74, 4–43 to 4–78, 4–82 to 4–95, 4–147, 12–98], American [N.T. 4–78 to 4–138, 8–197, 9–190 to 9–196, 12–98, 15–81 to 15–86, 15–91 to 15–115], Chase [N.T. 12–97 to 12–104, 12–107 to 12–109], St. Regis [N.T. 12–106 to 12–107], and other competitors through at least 1975 [N.T. 4–43, 4–75 to 4–96, 15–101 to 15–109]. Rue and other representatives from Chase engaged in these "verification" calls with representatives from Harley [N.T. 3–71 to 3–74, 4–62, 4–104 to 4–106], St. Regis [N.T. 15–103 to 15–104], American [N.T. 15–87 to 15–88, 15–104 to 15–105] and Continental [N.T. 12–97 to 12–104, 12–107 to 12–109], through at least late 1975 [N.T. 4–104 to 4–106, 15–104 to 15–112]. There was testimony at trial that, after a competitor's price was "verified," that price would be met but never undercut [N.T. 4–86, 4–103, 10–138 to 10–139, 12–123].

As various representative's "contacts" changed, these changes would be made known to the group as a whole or through personal, individual introductions. For example, at the meeting at Hilton Head Island held January 16, 1970, attended by Cooper and Landon of Continental, Alexander, Wells and Kiendl of Chase and representatives from St. Regis, American, Equitable Bag Company and Harley, Landon advised the group that Harris Weaver ("Weaver"), rather than Loughrey, was the person to call at Continental to "verify" prices [N.T. 3–61]. And at several PSSMA meetings beginning with the Palm Beach, Florida, meeting held January 9 to 11, 1974, Cooper introduced Mawicke and/or Weggeman to representatives of Harley and American and advised them that Mawicke and/or Weggeman was the person to contact at Continental for information on price "verifications" [N.T. 4–80, 14–168 to 14–171, 15–29 to 15–34, 15–71].

In addition to the testimony concerning meetings and telephone conversations during which the prices and the terms and conditions for the sale of consumer bags were discussed and agreed upon, the Government also introduced testimony that none of the competitors would ever increase prices on consumer bags without first consulting their competitors [N.T. 3–81 to 3–82, 3–148, 4–160 to 4–177], that each would have been unable to increase prices unless the other competitors agreed to the increase [N.T. 3–156 to 3–157], and that when a price increase was proposed, although no express commitment to follow the increase was announced to the group, at least two representatives felt that by their silence they had indicated to the group that their company would go along with the increase [N.T. 3–79 to 3–84, 10–194 to 10–200]. There was also testimony that the group "policed" or "monitored" itself by sending each other copies of their new price list pages [N.T. 4–153 to 4–160, 6–45 to 6–46, 6–75 to 6–105], or by advising each other that they had attempted to implement the agreed upon price increase but had been unable to do so because of strong customer resistance [N.T. 4–48 to 4–58].

Finally, the Government introduced evidence, by means of documents, graphs, charts and testimony, of the timing and amount of price increases effectuated by Continental, Chase, St. Regis, Harley and American.[3] As a summary of this evidence

---

**3.** As indicated in the body of this Opinion, price increases were generally announced in advance of the proposed date of implementation, and new published price list pages effectuating or formalizing these increases were issued at a later date. A summary of some of these published price lists, price announcements, the proposed price and the effective date (proposed

demonstrates, the competitors would announce their price increases in advance through "price announcement" letters which were sent to competitors and customers. These price announcements were followed by new published price list pages which formalized the price increases and the effective date, which pages were also distributed to competitors and customers. "Price protection" was a vehicle by which the competitors could maneuver the effective date of the price increase so that all competitors would, in actuality, increase their prices at approximately the same time [N.T. 11–70 to 11–74].

In their defense, the defendants, through individual or joint testimony, introduced evidence of the economic and competitive indicators of the consumer bag industry and the competition among the defendants. In addition, they testified that contacts among them had been solely for the purpose of complying with § 2(b) of the Robinson-Patman Act, 15 U.S.C. § 13(b), and that such contacts were necessary to meet their "good faith" defense and to prevent being "whipsawed" by "lying buyers." Finally, the defendants, testifying in their own defense or through representatives, denied having conspired to fix the prices or terms and conditions for the sale of consumer bags and testified that the prices and the terms and conditions for sale in the consumer bag industry, as well as their own conduct, were dictated by natural, competitive market forces.

## MOTIONS FOR JUDGMENT OF ACQUITTAL

■ In support of their Fed.R.Crim.P. 29(c) motions for judgment of acquittal, Continental, Chase, Cooper and Rue argue, jointly and individually, *inter alia*,[4] that the Government failed to produce sufficient evidence to sustain a conviction for a felony

violation of § 1 of the Sherman Act. Specifically, they argue that the Government failed to prove that: (1) the alleged conspiracy constituted a single, continuing conspiracy, as charged in the indictment, rather than a series of single conspiracies or isolated events; (2) the defendants knowingly and intentionally joined the conspiracy or had knowledge of the existence of an ongoing conspiracy; (3) the defendants acted with specific intent to restrain trade, an element required by the fact that the December 21, 1974, amendment of § 1 of the Sherman Act changed the penalty for its violation from a misdemeanor to a felony; (4) the alleged conspiracy unreasonably restrained trade and commerce; or, (5) the defendants engaged in conspiratorial acts within the felony period.

■ In ruling upon a Fed.R.Crim.P. 29(c) motion for judgment of acquittal, the crucial issue is whether the evidence, when viewed in a light most favorable to the Government, was such that a jury could have found beyond a reasonable doubt that the defendant was guilty as charged. *Glasser v. United States,* 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680 (1942); *United States v. Miah,* 433 F.Supp. 259, 264 (E.D.Pa.1977), *aff'd mem.,* 571 F.2d 573 (3d Cir. 1978). Where a conviction is based on circumstantial evidence, the evidence need not be inconsistent with every conclusion but that of guilt, provided that such circumstantial evidence provides the jury with a basis upon which to find the defendant guilty beyond a reasonable doubt. *United States v. Miah, supra,* 433 F.Supp. at 264. In reviewing testimony for purposes of determining a Fed.R.Crim.P. 29(c) motion, questions of the weight of the evidence or of the credibility of the witnesses are foreclosed by the jury's verdict. *Id.*

■ Section 1 of the Sherman Act, as amended December 21, 1974, provides, in pertinent part:

or actual) of the increase follows in an Appendix to this Memorandum at pages A–1 to A–2.

**4.** The Court notes that, although each of the defendants raised several grounds in support of their respective Fed.R.Crim.P. 29(c) motions for judgment of acquittal, the only ground

properly raised in support of a Fed.R.Crim.P. 29(c) motion is that the evidence presented at trial was insufficient to support a conviction as a matter of law. *United States v. Miah,* 433 F.Supp. 259, 264 n.3 (E.D.Pa.1977), *aff'd mem.,* 571 F.2d 573 (3d Cir. 1978).

Every contract, combination . . . or conspiracy, in restraint of trade . . among the several States . . . is declared to be illegal . . . Every person who shall make any contract or engage in any . . . conspiracy declared by sections 1–7 of this title to be illegal shall be deemed guilty of a felony . . . .

For the reasons stated below, we hold, first, that to sustain a conviction for a violation of § 1 of the Sherman Act, as amended December 21, 1974, the Government was required to prove: (1) that there existed a conspiracy as charged in the indictment, that the conspiracy was knowingly formed and that the defendants knowingly participated in the conspiracy; (2) that the conspiracy unreasonably restrained trade; and, (3) that the restraint was on interstate trade and commerce. Second, we hold, after a thorough review of the testimony and documents in this case, that the Government produced sufficient evidence of each of the requisite elements by which the jury could have found beyond a reasonable doubt that each of the defendants was guilty of having violated § 1 of the Sherman Act in the manner charged in the indictment.

The third element necessary to sustain a § 1 conviction, that the restraint was on interstate trade and commerce, was stipulated to by the parties in this case and, therefore, only the first two elements require discussion.

The first element necessary to sustain a § 1 violation, comprised of three subparts, required the Government to prove that: (a) there existed a conspiracy as charged in the indictment; (b) the conspiracy was knowingly formed; and, (c) the defendants knowingly participated in the conspiracy. With respect to the first subpart of this element, the Government was required to prove both that a conspiracy existed and that it conformed to the conspiracy charged in the indictment. *United States v. Masonite Corp.,* 316 U.S. 265, 275, 62 S.Ct. 1070, 86 L.Ed. 1461 (1942); *Interstate Circuit, Inc. v. United States,* 306 U.S. 208, 226–227, 59 S.Ct. 467, 83 L.Ed. 610 (1939); *United*

*States v. Patten,* 226 U.S. 525, 543, 33 S.Ct. 141, 57 L.Ed. 333 (1913).

To establish that a conspiracy existed, the Government was not required to prove any overt act other than the act of conspiracy. *Nash v. United States,* 229 U.S. 373, 378, 33 S.Ct. 780, 57 L.Ed. 1232 (1913). Nor was the Government required to prove an express, informal agreement, by words spoken or written, or simultaneous action. *United States v. Paramount Pictures, Inc.,* 334 U.S. 131, 142, 68 S.Ct. 915, 92 L.Ed. 1260 (1948); *American Tobacco Co. v. United States,* 147 F.2d 93 (6th Cir. 1944), aff'd., 328 U.S. 781, 809–810, 66 S.Ct. 1125, 90 L.Ed. 1575 (1946); *Frey & Son, Inc. v. Cudahy Packing Co.,* 256 U.S. 208, 210, 41 S.Ct. 451, 65 L.Ed. 892 (1921); *Esco Corp. v. United States,* 340 F.2d 1000, 1007–1008 (9th Cir. 1965). Nor was the Government required to prove that the means used to accomplish the unlawful objective were in themselves unlawful. *American Tobacco Co. v. United States, supra,* 328 U.S. at 809–810, 66 S.Ct. 1125. Rather,

where the circumstances are such as to warrant a jury in finding that the conspirators had a unity of purpose or a common design and understanding, or a meeting of the minds in an unlawful arrangement, the conclusion that a conspiracy is established is justified. . . .

*American Tobacco Co. v. United States, supra,* 328 U.S. at 810, 66 S.Ct. at 1139; *see also United States v. Paramount Pictures, Inc., supra,* 334 U.S. at 142, 68 S.Ct. 915; *Interstate Circuit, Inc. v. United States, supra,* 306 U.S. at 227, 59 S.Ct. 467. Evidence of such a conspiracy may be implied from a course of dealing or other circumstances, such as the conduct of the parties. *Frey & Son, Inc. v. Cudahy Packing Co., supra,* 256 U.S. at 210, 41 S.Ct. 451; *Coleman Motor Co. v. Chrysler Corp.,* 525 F.2d 1338, 1345 (3d Cir. 1975).

Furthermore, because the indictment in this case charged the defendants with having engaged in a continuing conspiracy, the Government was required to prove that the conspiracy which existed was a single, continuing conspiracy rather than

a series of separate conspiracies or isolated episodes. A single, continuing conspiracy is demonstrated where the evidence proves that the essential feature of the existing conspiracy was a common plan or scheme to achieve a common, single, comprehensive goal. *Blumenthal v. United States,* 332 U.S. 539, 557–559, 68 S.Ct. 248, 92 L.Ed. 154 (1947). A single, continuing conspiracy is not transformed into a series of separate conspiracies merely because the Government's proof demonstrates that the conspiracy continued over a period of time or that the. characters involved in the conspiracy changed over the course of time, or because there is a time gap in the Government's proof. *Braverman v. United States,* 317 U.S. 49, 52, 63 S.Ct. 99, 87 L.Ed. 23 (1942); *United States v. Stromberg,* 268 F.2d 256, 263–264 (2d Cir.), *cert. denied,* 361 U.S. 863, 80 S.Ct. 119, 4 L.Ed.2d 102 (1959). A single, continuing conspiracy may contemplate a series of offenses, or be comprised of a series of steps in the formation of a larger, general conspiracy. *Braverman v. United States, supra,* 317 U.S at 52, 63 S.Ct. 99; *Blumenthal v. United States, supra,* 332 U.S. at 557–559, 68 S.Ct. 248. Therefore, where the evidence at trial is sufficient for the jury to infer that the essential features of the existing conspiracy were a common plan or scheme to achieve a common, single, comprehensive goal or end, then the conclusion that the conspiracy was a single, continuing conspiracy is justified. *Blumenthal v. United States, supra,* 332 U.S. at 557–559, 68 S.Ct. 248; *United States v. Cirillo,* 468 F.2d 1233, 1238–1239 (2d Cir. 1972), *cert. denied,* 410 U.S. 989, 93 S.Ct. 1501, 36 L.Ed.2d 188 (1973).

■ The second and third sub-components of this first element are interrelated. In essence, they require the Government to demonstrate that the overall objects, aims or goals of the conspiracy were consciously agreed to and that the defendants knowingly participated in the agreement or conspiracy to achieve the agreed upon goals, or in other words, "that a concert of action be contemplated and the defendants conform to the arrangement." *United States v. Paramount Pictures, Inc., supra,* 334 U.S. at 142, 68 S.Ct. at 922, *citing Interstate' Circuit, Inc. v. United States, supra; American Tobacco Co. v. United States, supra,* 328 U.S. at 809–810, 66 S.Ct. 1125; *United States v. American Rad. & Stan. San. Corp.,* 433 F.2d 174, 182 (3d Cir. 1970), *cert. denied,* 401 U.S. 948, 91 S.Ct. 928, 28 L.Ed.2d 231 (1971). The element of intent which the Government was required to prove was that the defendants acted knowingly in forming and participating in the conspiracy. Proof of specific intent to violate the Sherman Act is not required, for if a defendant charged with a violation of the Sherman Act is found by the jury to have acted knowingly, then that defendant is held to have intended the necessary and direct consequences of his acts, *i. e.,* the resulting unreasonable restraint on trade. *United States v. Masonite Corp., supra,* 316 U.S. at 275, 62 S.Ct. 1070, *quoting United States v. Patten, supra,* 226 U.S. at 543, 33 S.Ct. 141; *United States v. Champion Int'l Corp.,* 557 F.2d 1270, 1274 (9th Cir. 1974), *cert. denied,* 434 U.S. 938, 98 S.Ct. 428, 54 L.Ed.2d 298 (1977); *cf. United States v. Nu-Phonics, Inc.,* 433 F.Supp. 1006, 1015 (E.D.Mich. 1977).

■ Neither the December 21, 1974, amendment of § 1 of the Sherman Act, nor the recent decision of the United States Supreme Court in *United States v. United States Gypsum Co.,* 550 F.2d 115 (3d Cir. 1977), *aff'd,* —— U.S. ——, 98 S.Ct. 2864, 57 L.Ed.2d 854 (1978), altered or amended this requirement that the Government prove that the defendants acted knowingly rather than with specific intent. First, in *Gypsum,* the Supreme Court squarely held that specific intent is not a required element to support a misdemeanor violation of § 1 of the Sherman Act. In *Gypsum,* the Supreme Court first held that a criminal violation of the Sherman Act is not a strict liability offense but, rather, requires an element of intent. *United States v. United States Gypsum Co., supra,* at ——, 98 S.Ct. 2864. Turning next to the issue of the degree or character of the intent required to support a criminal violation of the Sherman Act, the Supreme Court specifically stated that the issue before it was:

. . . whether a criminal violation of the antitrust laws requires, in addition to proof of anticompetitive effects, a demonstration that the disputed conduct was undertaken with the "conscious object" of producing such effects or whether it is sufficient that the conduct is shown to have been undertaken with knowledge that the proscribed effects would most likely follow.

*Id.,* at ——, 98 S.Ct. at 2877. The Court concluded that:

. . . action undertaken with knowledge of its probable consequences and having the requisite anticompetitive effects can be a sufficient predicate for a finding of criminal liability under the antitrust laws [21] . . . The business behavior which is likely to give rise to criminal antitrust charges is conscious behavior normally undertaken only after a full consideration of the desired results and a weighing of the costs, benefits and risks. A requirement of proof not only of this knowledge of likely effects, but also of a conscious desire to bring them to fruition or to violate the law would seem, particularly in such a context, both unnecessarily cumulative and unduly burdensome. Where carefully planned and calculated conduct is being scrutinized in the context of a criminal prosecution, the perpetrator's knowledge of the anticipated consequences is a sufficient predicate for a finding of criminal intent.

*Id.* at —— – ——, 98 S.Ct. at 2878. And in footnote 21 of its Opinion, the Supreme Court noted:

In so holding, we do not mean to suggest that conduct undertaken with the purpose of producing anticompetitive effects would not also support criminal liability, even if such effects did not come to pass. Cf. *United States v. Griffith,* 334 U.S. 100, 105 [68 S.Ct. 941, 92 L.Ed. 1236] (1948). We hold only that this elevated standard of intent need not be established in cases where anticompetitive effects have been demonstrated; instead proof that the defendant's conduct was undertaken with knowledge of its probable consequences will satisfy the Government's burden.

In its analysis, the Supreme Court noted the fact that the penalty for a violation of § 1 of the Sherman Act had been increased by the December 21, 1974, amendment, but did not discuss the application of its holding to post-amendment cases. Thus, its holding that specific intent is not a requisite element of a criminal violation of the Sherman Act must be limited to misdemeanor cases and also construed as reaffirming the longstanding rule that proof of specific intent is not required to support criminal convictions under the Sherman Act. Furthermore, despite this longstanding principle, Congress' December 21, 1974, amendment of § 1 of the Sherman Act altered only the penalty but did not, either explicitly or implicitly, as the legislative history of the amendment clearly demonstrates, *see e. g.,* 120 Cong. Rec. 36340 (1974), alter the substantive elements of the offense. Thus, the principle that, to support a conviction for a violation of § 1 of the Sherman Act, the Government is required to prove only that the defendant acted knowingly rather than with specific intent, must be held to apply equally to felony convictions for a violation of § 1 of the Sherman Act. For where Congress chooses to amend a statute such as the Sherman Act but chooses to neither expressly nor impliedly amend the substantive provisions of that Act, even though it clearly has the power to do so, federal courts are without power to constructively alter those substantive elements. *Cf. United States v. Wise,* 370 U.S. 405, 416, 82 S.Ct. 1354, 8 L.Ed.2d 590 (1962).

▮▮▮ The second element which the Government was required to prove to support the defendants' convictions in the instant case was that the conspiracy in which the defendant knowingly participated unreasonably restrained trade and commerce. It is hornbook law, however, that a conspiracy to fix, maintain and stabilize the prices and the terms and conditions of sale is a *per se* violation of the Sherman Act and, thus, the unreasonableness of the restraint is conclusively presumed. *United States v. Masonite Corp., supra,* 316 U.S. at 274, 62 S.Ct.

1070; *United States v. Socony-Vacuum Oil Co.,* 310 U.S. 150, 218, 60 S.Ct. 811, 84 L.Ed. 1129 (1940); *Ethyl Gasoline Corp. v. United States,* 309 U.S. 436, 458, 60 S.Ct. 618, 84 L.Ed. 852 (1940); *United States v. Trenton Potteries Co.,* 273 U.S. 392, 397–402, 47 S.Ct. 377, 71 L.Ed. 700 (1927); *see also United States v. General Motors Corp.,* 384 U.S. 127, 145–146, 86 S.Ct. 1321, 16 L.Ed.2d 415 (1966); *United States v. Parke, Davis & Co.,* 362 U.S. 29, 47, 80 S.Ct. 503, 4 L.Ed.2d 505 (1960). As with the requirement that knowing conduct rather than specific intent is an element of a Sherman Act offense, the Supreme Court's opinion in *Gypsum* did not alter or amend the application of the *per se* rule to criminal violations of the Sherman Act. Rather, the Supreme Court expressly noted, and thus constructively reaffirmed, the longstanding *per se* rule as applied to certain well-defined categories of cases. *Id.,* —— U.S. at ——, 98 S.Ct. 2864. However, in *Gypsum,* the Supreme Court found that, despite the Government's allegations in the indictment that the *Gypsum* defendants had conspired to fix prices, a long-established *per se* violation, because of the Government's almost exclusive reliance upon the defendants' exchange of information among competitors to support its allegation, the conduct at issue was subject to the "Rule of Reason" rather than the *per se* rule. *Id.,* at —— and n.16, 98 S.Ct. 2864. Thus, the Supreme Court's opinion in *Gypsum,* by recognizing but distinguishing the application of the *per se* rule in the case before it, cannot be held to have altered or amended that rule as applied to criminal antitrust violations. And as with the element of specific intent, Congress' failure, either explicitly or implicitly, to alter or amend the application of the *per se* rule to criminal violations of the Sherman Act by its December 21, 1974, amendment of those provisions must be construed as having retained the application of the rule in a felony context.

Furthermore, we do not find the Supreme Court's use of the phrase "in addition to proof of anticompetitive effects" in the forming of the issue before it, or its statement in footnote 21 that specific intent need not be established where anticompetitive effects have been demonstrated, *Id.,* at ——, 98 S.Ct. at 2877, as having abolished the application of the *per se* rule in a criminal antitrust context because of its recognition but distinction of the application of the *per se* rule to the case before it.

■ Finally, because the defendants in this case were charged with a violation of § 1 of the Sherman Act subsequent to the amendment changing the penalty from a misdemeanor to a felony, the Government was required to prove that the defendants knowingly joined and participated in the conspiracy after the date of the amendment, December 21, 1974, and prior to the date of the return of the indictment, October 29, 1976.

■ Because we find, after a thorough examination of the evidence presented in this case, that the Government clearly presented sufficient evidence of each of the required elements by which a jury could have found beyond a reasonable doubt that the defendants were guilty as charged, we will deny the Fed.R.Crim.P. 29(c) motions for judgment of acquittal of Continental, Chase, Cooper and Rue.

## MOTIONS FOR NEW TRIAL

In support of their motions for a new trial, pursuant to Fed.R.Crim.P. 33,[5] the defendants jointly argue, *inter alia,* that: (1) the Court erred in failing to exclude or restrict the admission of testimony of events which occurred in the 1950's through the early 1970's, and in failing to give cautionary instructions to the jury with respect to such evidence; (2) the Court erred in denying defendants' pretrial motion to regulate the order of proof and in admitting

---

**5.** The Court notes that many of the grounds raised by defendants in support of their Fed.R. Crim.P. 29(c) motions are more properly raised in support of their Fed.R.Crim.P. 33 motions. Accordingly, to the extent that such grounds are deemed nonfrivolous, we will consider them as having been raised in support of the defendants' respective Fed.R.Crim.P. 33 motions.

hearsay declarations of alleged coconspirators; and, (3) the Court's charge to the jury was meaningless and confusing, failed to relate legal principles to the issues in this case and failed to adequately explain the complex legal issues involved. Continental, Chase and Rue also argue individually, *inter alia,* that errors in the Court's charge to the jury entitle them to a new trial.

First, we find that the Court properly admitted testimony of events occurring during the 1950's through the early 1970's, properly admitted hearsay declarations of alleged coconspirators and properly instructed the jury with respect to this testimony. It is well settled that evidence of conduct occurring prior to the time period covered by the indictment is admissible for the purpose of demonstrating, *inter alia,* the intent, purpose or aim of the parties to the offense. *American Tobacco Co. v. United States, supra,* 147 F.2d at 119; *United States v. Cioffi,* 493 F.2d 1111, 1115 (2d Cir.), *cert. denied,* 419 U.S. 917, 95 S.Ct. 195, 42 L.Ed.2d 155 (1974); *United States v. Hickey,* 360 F.2d 127, 139–140 (7th Cir.), *cert. denied,* 385 U.S. 928, 87 S.Ct. 284, 17 L.Ed.2d 210 (1966). This is particularly true in federal antitrust conspiracy cases, where evidence of events or conduct occurring prior to the statutory period of the offense or before the commencement of the conspiracy has been held to be admissible for the purpose of demonstrating the fact that a given conspiracy is a continuing one or to explain the acts and declarations of the conspirators once the conspiracy commences. *United States v. Dunham Concrete Prod., Inc.,* 475 F.2d 1241, 1250 (5th Cir.), *reh. denied,* 477 F.2d 596, *cert. denied,* 414 U.S. 832, 94 S.Ct. 65, 38 L.Ed.2d 66 (1973); *United States v. Hickey, supra,* 360 F.2d at 139–140; *United States v. Johnson,* 165 F.2d 42, 45 (3d Cir. 1947), *cert. denied,* 332 U.S. 852, 68 S.Ct. 355, 92 L.Ed.2d 421 (1948); *United States v. General Motors Corp.,* 121 F.2d 376, 408 (7th Cir.), *cert. denied,* 314 U.S. 618, 62 S.Ct. 105, 86 L.Ed. 497 (1941). Nor is it error to admit evidence of conduct which occurred prior to the date that the applicable statute was amended to define that conduct as criminal, for the purpose of demonstrating, *inter alia,* intent, motive or purpose, where that conduct continued subsequent to the amendment of the statute. *United States v. Ferrara,* 458 F.2d 868, 874–875 (2d Cir.), *cert. denied,* 408 U.S. 931, 92 S.Ct. 2498, 33 L.Ed.2d 343 (1972); *United States v. Marchesani,* 457 F.2d 1291, 1294–1295 (6th Cir. 1972). In the instant case, the indictment alleged that the continuing conspiracy in violation of § 1 of the Sherman Act, in which the defendants each joined and participated, began at least as early as 1950 and continued until the indictment was returned on October 29, 1976. The substantive offense with which the defendants were charged constituted a criminal offense during the entire period of the conspiracy as that conspiracy was defined in the indictment. While the penalty for a violation of § 1 of the Sherman Act was changed from a misdemeanor to a felony by the December 21, 1974, amendment of § 1 of the Sherman Act, the substantive elements of the offense remained unchanged throughout the period covered by the indictment. Because the defendants in this case were indicted after the penalty for the commission of this offense was changed to a felony, the jury was required to find beyond a reasonable doubt that each defendant knowingly participated in the conspiracy during the period from December 21, 1974, the date of the amendment, to October 29, 1976, the date the indictment was returned, before finding that particular defendant guilty as charged. However, the jury could properly consider acts, declarations or other conduct which occurred prior to the defined time period for the purpose of determining the intent, purpose, goal or conduct of each of the defendants during the defined felony period. The Court in this case correctly instructed the jury accordingly [N.T. 35–36 to 35–37].

Second, it is well settled that the order of proof at trial is within the discretion of the Court. *Geders v. United States,* 425 U.S. 80, 86, 96 S.Ct. 1330, 47 L.Ed.2d 592 (1976). Specifically, in a conspiracy case, statements or other evidence

not otherwise admissible but for the conspiracy may be conditionally admitted into evidence subject to a demonstration, as shown by subsequent independent proof, of their connection with the conspiracy. *United States v. Graham*, 548 F.2d 1302, 1308 (8th Cir. 1977). Thus, ". . . declarations of one coconspirator may be received at any time during the course of the trial subject to subsequent proof of the existence of the conspiracy and the connection of the defendant therewith." *United States v. Vespe*, 389 F.Supp. 1359, 1369 (D.Del.), *aff'd sub nom.*, *United States v. Shaffer*, 520 F.2d 1369 (3d Cir. 1975) (per curiam), *cert. denied*, 423 U.S. 1051, 96 S.Ct. 779, 46 L.Ed.2d 640 (1976) (citations omitted). *United States v. Trowery*, 542 F.2d 623 (3d Cir. 1976) (per curiam), *cert. denied*, 429 U.S. 1104, 97 S.Ct. 1132, 51 L.Ed.2d 555 (1977), and *Krulewitch v. United States*, 336 U.S. 440, 69 S.Ct. 716, 93 L.Ed. 790 (1949), cited insistently and frequently by the defendants throughout the course of the trial, as well as in support of their motions for a new trial, are not inapposite. In *Trowery*, the Third Circuit enunciated the well-settled rule, stated above, that to determine whether statements of an alleged coconspirator are competent against the non-declarant, the trial judge must determine whether it has been proved, by a clear preponderance of the evidence independent of the hearsay statement, that a joint undertaking existed at the time of the statement or action and that the declarant was a participant. *United States v. Trowery, supra*, 542 F.2d at 626–627. The enunciation of this rule, however, does not affect the corollary rule that the *order* of admitting such proof is left to the discretion of the trial court. Thus, the Government, while required to meet this burden of proof, was permitted to introduce the hearsay evidence subject to later connection with the conspiracy, by clear, independent evidence and to the satisfaction of the trial court. *United States v. Graham, supra; United States v. Vespe, supra*. And *Krulewitch* is distinguishable from the case at bar because, in that case, the Supreme Court reversed the petitioner's conviction for the reason that hearsay declarations attributed to a coconspirator which were made subsequent to the conclusion of the conspiracy rather than pursuant to, or in furtherance of, the conspiracy were erroneously admitted into evidence. *Krulewitch v. United States, supra*, 336 U.S. at 442–445, 69 S.Ct. 716.

■ In the instant case, the Court did not abuse its discretion to permit the Government to introduce hearsay statements of alleged coconspirators subject to their later connection with the conspiracy by clear, independent evidence, because the evidence in this case clearly was sufficient for the jury to find beyond a reasonable doubt that a conspiracy existed and that each of the defendants knowingly joined and participated in that conspiracy during the felony period.

Finally, the defendants jointly, and Continental, Chase and Rue individually, argue that the Court's charge to the jury was improper. First, each defendant jointly argues that the Court's charge was improper because it consisted almost entirely of abstract statements of general legal principles unrelated to the evidence, the particular circumstances of each defendant or the individual contentions of the parties. Specifically, they argue that, "except as an afterthought," the Court failed to instruct the jury in a manner which would sufficiently illuminate the jury with respect to the individual defendants' theories of defense or with reference to the specific facts. of the case. In addition, the defendants argue, *inter alia*, that the Court erred by refusing or failing to adequately cover the defendants' joint requested points for charge and by giving, either verbatim or in substance, the Government's requests to charge. We find, after a thorough review of the record, the Court's charge to the jury in this case and the relevant authorities, that the Court properly, adequately, correctly and fairly instructed the jury in this case. We find, further, that all of the defendants' requested points for charge, to the extent that they were clear, correct and unbiased, were properly and fairly incorporated into, or "covered," by the Court's charge to the jury.

 It is well settled that a Court ". . . must fairly and impartially state the issues and applicable law in logical sequence and in the common speech of men if the jury is to understand the issues and intelligently apply the law." *Elbel v. United States*, 364 F.2d 127, 134 (10th Cir. 1966), *cert. denied*, 385 U.S. 1014, 87 S.Ct. 726, 17 L.Ed.2d 550 (1967). It is also well settled that "a defendant in a criminal case is entitled to have the jury instructed on any theory of defense for which there is any foundation in the evidence, however tenuous." *United States v. Mathis*, 175 U.S. App.D.C. 341, 343, 535 F.2d 1303, 1305–1306 (1976); *United States v. Bastone*, 526 F.2d 971, 987 (7th Cir. 1975), *cert. denied*, 425 U.S. 973, 96 S.Ct. 2172, 48 L.Ed.2d 797 (1976); *United States v. Smith*, 410 F.Supp. 1256, 1259 (E.D.Pa.1976). And finally, it is well settled that a trial court commits reversible error if it fails to relate the law to the particular facts of the case. *United States v. Holley*, 502 F.2d 273, 276 (4th Cir. 1974). But it is also well settled that a trial court is not required to give a detailed summary of the evidence and that it is bound to avoid instructions to the jury which are confusing and which tend to direct the jury's attention away from the issues they are called upon to decide. *United States v. Bastone, supra*, 526 F.2d at 987, *citing United States v. American Rad. & Stan. San. Corp., supra*, 433 F.2d at 189; *United States v. Holley, supra*, 502 F.2d at 276.

 Furthermore, a trial judge has broad discretion in ruling on points for charge and it is not error to refuse to instruct as counsel wishes if the charge to the jury is correct. *United States v. Blair*, 456 F.2d 514, 520 (3d Cir. 1972) (citations omitted); *United States v. American Rad. & Stan. San. Corp., supra*, 433 F.2d at 199. This is particularly true where the requested points for charge were ". . . prolix, imprecise and often intertwined eviden-

tiary assumptions with law in a highly partisan manner." *United States v. American Rad. & Stan. San. Corp., supra*, 433 F.2d at 199.

 In the instant case, a thorough reading of the Court's charge to the jury demonstrates that the Court fairly, impartially, adequately and completely, and in language the jury could understand, instructed the jury as to the law and issues in this case. Such a reading will also demonstrate that the Court clearly, correctly, fairly and impartially instructed the jury with respect to the defendants' theories of defense [N.T. 35–32 to 35–34, 35–43 to 35–44, 35–59 to 35–62, 35–147 to 35–149].[6] Finally, many of the requested points for charge submitted by the defendant in the instant case were imprecise, misleading and partial and incorrectly stated the applicable law. The Court, in ruling upon the defendants' requested points for charge, clearly advised counsel of its intentions with respect to its instructions to the jury. *Id.* And, to the extent that the defendants' requested points for charge were proper and correct, they were clearly, fairly and correctly incorporated into the Court's charge to the jury, in substance if not verbatim.

 Finally, while Continental's individual objections to the Court's instructions have been discussed fully in other parts of this Opinion, those of Chase and of Rue, as an employee of Chase, require discussion, if only because of the strenuous persistence with which they are urged. In essence, Chase's objections and those of Rue as a representative of Chase are, *inter alia*, that because of the "special position" of Rue and Chase they were prejudiced when the Court failed to explain their contentions . and theories of defense to the jury and that the Court erred when it only presented the jury with abstract legal principles. In particular, Chase argues that the Court erred when it failed to instruct the jury as Chase

---

**6.** The Court notes that, contrary to Chase's assertions that these instructions were mentioned "only as an afterthought, as the jury was on its feet and leaving the jury box to deliberate," *see* Chase's Memorandum of Law, p. 57, the jury, although excused by the Court and then recalled, was seated and attentive while these instructions were being given [N.T. 35–59 to 35–62].

had requested, when it failed to single out for the jury Chase's "special position" and when it failed to instruct the jury adequately on Chase's theory of defense. First, as stated *supra*, a trial court is not required to adopt a defendant's requested points for charge verbatim, particularly when those requested points are "prolix, imprecise or intertwine evidentiary assumptions with law in a highly partisan manner." *United States v. Mathis, supra*, 175 U.S.App.D.C. at 343, 535 F.2d at 1305; *United States v. American Rad. & Stan. San. Corp., supra*, 433 F.2d at 199. Nor is a trial court required to, and indeed it would be error to, single out a particular defendant in a multidefendant case in a manner which would in any way prejudice that defendant. *Id.* A careful reading of Chase's requested points for charge in this case reveals that they were, to a great extent, highly misleading, erroneous and colored by Chase's determined belief that specific intent and conduct which unreasonably restrained trade were essential elements of a § 1 felony violation. Further, Chase's request that the Court instruct the jury as to Chase's "special position" amounted to, in essence, a request that the Court instruct the jury to acquit both Chase and Rue, an instruction unwarranted by the evidence. Moreover, to have singled out Chase or, by definition, Rue in the manner requested by counsel would have unfairly and severely prejudiced both Chase and Rue by specifically calling attention to the conduct of two defendants in a multidefendant conspiracy case where that conduct, despite Chase's assertions to the contrary, did not differ significantly from that of their codefendants.

■ Finally, despite Chase's vigorous assertions to the contrary, its theory of defense was not as clear to the Court as Chase urges that it was. Presented with Chase's plethora of "jury aids," documents, outlines and charts, as demonstrated particularly by Chase's six-page outline of its opening statement to the jury, its economic evidence and its requested and supplemental requested points for charge, it was never clear to the Court whether Chase's theo-ry of defense was either that: (1) the prices charged by the defendants for consumer bags, although fixed by the conspirators and not by free market forces, were reasonable prices and, therefore, Chase's conduct in conspiring to fix those prices did not violate § 1 of the Sherman Act; or, (2) the prices charged by the defendants for consumer bags were determined by free market forces and Chase's conduct in the market place was determined solely by those market forces, such as price followership and competition; or, (3) both of the above. To the extent that Chase's defense theory was the second alternative listed above, that theory was clearly, fairly and adequately explained to the jury. To the extent that Chase's defense theory was the first alternative listed above, as based upon Chase's belief that specific intent and conduct in unreasonable restraint of trade were essential elements of a § 1 felony charge, that theory was clearly erroneous and it was clearly not error for the Court to decline to instruct the jury in accordance with Chase's first alternative theory.

■ One final issue requires discussion. Subsequent to the completion of this Memorandum Opinion, but prior to its filing, the defendants filed a joint motion for leave to file a supplemental memorandum in support of their previously filed post-trial motions, in light of the Supreme Court's recent opinion in *Gypsum, supra*. In their supplemental memorandum, the defendants argue that the Court's charge to the jury on the issue of intent in the instant case constituted reversible error because it instructed the jury to find that wrongful intent could be presumed from conduct as a matter of law and, thus, was indistinguishable from the charge found by the Supreme Court in *Gypsum* to have constituted reversible error. We disagree.

In *Gypsum*, the trial court instructed the jury that:

> [t]he law presumes that a person intends the necessary and natural consequences of his acts. Therefore, if the effect of the exchanges of pricing information was

to raise, fix, maintain and stabilize prices, then the parties to them are presumed, as a matter of law, to have intended that result.

*United States v. United States Gypsum Co., supra*, —— U.S. at ——, 98 S.Ct. at 2869. In ruling that the second sentence of the instructions noted above constituted reversible error, the Supreme Court said:

> We agree . . . that an effect on prices, *without more*, will not support a criminal conviction under the Sherman Act . . . [we] hold that a defendant's state of mind or intent is an element of a criminal antitrust offense which must be established by evidence and inferences drawn therefrom and cannot be taken from the trier of fact through reliance on a legal presumption of wrongful intent from proof of an effect on prices. . . . we are unwilling to construe the Sherman Act as mandating a regime of strict liability criminal offenses.

*Id.*, at ——, 98 S.Ct. at 2872 (emphasis added) (footnotes omitted). Having concluded that intent was an element of a criminal antitrust violation, the Court then held that:

> [A]ction undertaken with knowledge of its probable consequences and having the requisite anticompetitive effects can be a sufficient predicate for a finding of criminal liability under the antitrust laws.

*Id.*, at ——, 98 S.Ct. at 2877 (footnote omitted). In conclusion, the Court noted that the infirmity inherent in the *Gypsum* instructions, contained in the second sentence of the instructions noted above, was that they permitted a presumption of the defendants' intent to be inferred solely from the effect of the defendants' conduct on prices. *Id.*, at ——, 98 S.Ct. 2864.

In the instant case, the Court instructed the jury as follows:

> Now in order to establish the offense charged in this indictment the proof need not show that the accused acted willfully or with specific intent or bad purpose either to disobey or disregard the law. The element of intent is the offense charged as established if the evidence in the case shows beyond a reasonable doubt that the act or acts of the accused were voluntarily and intentionally; that is, that they were knowingly done.
>
> The purpose of that word "knowingly" is to insure that no one will be convicted for an act done because of mistake or inadvertance [*sic*] or accident or other innocent reason.
>
> If these acts knowingly done resulted in an agreement of the type forbidden by the Sherman Act, the law presumes that the person so acting intended that result as being the necessary and natural consequence of those acts.

[N.T. 35–29 to 35–30]. As a reading of these instructions clearly indicates, the jury was instructed not only that it must find the requisite intent of the defendants to have been established by the evidence beyond a reasonable doubt, but also that the element of intent they were required to find was that the defendants had acted knowingly, *i. e.*, with knowledge of the probable consequences of their actions. The Court's charge to the jury on the issue of intent in the instant case thus clearly comports with the spirit, analysis and holding of the Supreme Court in *Gypsum* on the issue of intent necessary to support a criminal antitrust violation.

Accordingly, for the reasons stated above, the motions of defendants Continental, Chase, Cooper and Rue for a new trial, pursuant to Fed.R.Crim.P. 33, will be denied.

## MOTIONS IN ARREST OF JUDGMENT

The grounds raised by the defendants in support of their Fed.R.Crim.P. 34 motions in arrest of judgment [7] have all been care-

---

7. The Court notes that the only ground properly raised in support of a Fed.R.Crim.P. 34 motion is that the indictment does not properly charge an offense. *See United States v. Miah, supra*, 433 F.Supp. at 263 n.2.

fully reviewed by the Court. Those grounds deemed nonfrivolous have been discussed fully in the section of this Opinion which determined the defendants' Fed.R.Crim.P. 29(c) motions for judgment of acquittal and have been found lacking in merit. Accordingly, the Fed.R.Crim.P. 34 motions in arrest of judgment of Continental, Chase, Cooper and Rue will be denied.

An appropriate Order will be entered.

## APPENDIX

### A. Increase in manufacturing charges

| | Published Price List | | Price Announcement | | | |
|---|---|---|---|---|---|---|
| | effective date | price | date | effective date | price | exhibit # |
| Chase | 3/ 1/70 | $3.65 | 1/ 9/70 | 3/ 3/70 | $3.65 | G–1395 |
| | | | 2/ 6/70 | 3/ 3/70 | 3.65 | G–1396 |
| Continental | 3/ 1/70 | 3.65 | 1/ 9/70 | | | |
| | | | 2/ 5/70 | 3/ 1/70 * | 3.65 | G–385 |
| | | | | | | G–1437 |
| | | | | | | G–330 |
| American | none | none | none | none | none | none |
| Harley | 3/20/70 | 3.65 | 3/27/70 ** | 3/20/70 | 3.65 | G–220 |
| St. Regis | 4/18/70 | 3.65 | 4/ 6/70 | 4/18/70 | 3.65 | G–2142 |

\* Price protection given if order shipped within 120 days of March 1, 1970.
\*\* Price announcement mailed late, so affirmed on March 27, 1970.

### B. Increase in manufacturing charges

| | Published Price List | | Price Announcement | | | |
|---|---|---|---|---|---|---|
| | effective date | price | date | effective date | % increase | exhibit # |
| Chase | 11/ 1/70 | $3.75 | 10/13/70 | 11/ 1/70 * | 3% | G–1398 |
| Continental | 11/ 1/70 | 3.75 | 10/ 7/70 | 11/ 1/70 ** | 3% | G–3491 |
| | | | 10/26/70 | 11/ 1/70 | | G–3500 |
| American | none | none | none | none | none | none |
| Harley | 11/ 1/70 | 3.75 | 10/ 8/70 | 11/ 1/70 | 3% | G–223 |
| St. Regis | 11/ 6/70 | 3.75 | 10/29/70 | 11/ 6/70 *** | 3% | G–2143 |

\* Price protection on orders for 250,000 to 499,000 if shipped before 1/31/71; on orders of 500,000 if shipped before 2/8/71.
\*\* Price protection if shipped before 3/1/71.
\*\*\* Price protection if shipped before 2/28/71.

### C. Increase in manufacturing charges

| | Published Price List | | Price Announcement | | |
|---|---|---|---|---|---|
| | effective date | price | date | effective date | exhibit # |
| Chase | 10/ 1/73 | $4.20 | 8/31/73 | 10/ 1/73 * | G–1411 |
| Continental | 10/ 1/73 | 4.20 | 10/ 1/73 | 10/ 1/73 * | G–3407 |
| American | 10/ 1/73 | 4.20 | 9/ 7/73 | 10/ 1/73 ** | G–4342 |
| Harley | 10/ 1/73 | 4.20 | 9/ 8/73 | 10/ 1/73 * | G–2477 |
| St. Regis | 3/ 8/74 | 4.20 | 3/ 7/74 | 3/ 7/74 | G–2153 to G–2157 |

\* Price protection if shipped before 1/1/74.
\*\* Price protection if shipped before 12/31/73.

D. Increase in manufacturing charges

| | Published Price List | | Price Announcement | | |
|---|---|---|---|---|---|
| | effective date | price | date | effective date | exhibit # |
| Chase | 1/ 2/75 | $4.70 | 11/25/74 | 1/ 1/75 | G–1423 |
| | 1/ 2/75 * | 8.15 * | 1/24/75 * | 1/24/75 ** | G–1426 |
| | | (1 & 2 ply) | | | |
| | | 10.65 * | | | |
| | | (3 ply) | | | |
| Continental | 1/ 1/75 | 4.70 | 10/31/74 | 1/ 1/75 | G–3521 |
| | 2/20/75 * | 8.15 * | | | |
| | | (1 & 2 ply) | 1/ 6/75 * | 1/ 1/75 ** | G–3524 |
| | | 10.65 * | | | |
| | | (3 ply) | | | |
| American | 1/ 1/75 | 4.70 | 1/ 7/75 | 1/31/75 | G–4347 |
| | 2/20/75 * | 8.15 * | | | |
| | | (1 & 2 ply) | | | |
| | | 10.65 * | | | |
| | | (3 ply) | | | |
| Harley | 1/ 1/75 * | 8.15 * | 12/17/74 * | | G–275 |
| | | (1 & 2 ply) | | | |
| | | 10.65 * | 1/ 3/75 * | 1/ 1/75 * | G–276 |
| | | (3 ply) | | | |
| St. Regis | 12/30/74 * | 8.15 * | 12/ 6/74 * | 12/30/74 * | G–2164 |
| | | (1 & 2 ply) | 12/10/74 * | 12/30/74 * | G–2165 |
| | | 10.65 * | | | |
| | | (3 ply) | | | |

\* Refers to pet food price lists.
\*\* No new price page published.