judgment of the district court will be affirmed.

UNITED STATES of America

v.

CONTINENTAL GROUP, INC.,
Appellant in No. 78–2328.

UNITED STATES

v.

CHASE BAG COMPANY, Appellant
in No. 78–2330.

UNITED STATES

v.

COOPER, James K., Appellant in
No. 78–2331.

UNITED STATES

v.

RUE, Harrison B., Appellant in
No. 78–2332.

Nos. 78–2328 and 78–2330 to 78–2332.

United States Court of Appeals,
Third Circuit.

Argued April 3, 1979.

Decided July 20, 1979.

As Amended Aug. 28, 1979.

district court. Such a complaint is not a proper ground for a Rule 35 motion. Similarly, any relief due appellants as a result of beatings or other improper conditions of confinement is available through proceedings other than those pursuant to a motion to reduce sentence.

Patrick T. Ryan (argued), William J. Lehane, Wilson M. Brown, III, Drinker, Biddle & Reath, Philadelphia, Pa., for appellant Continental Group, Inc.

Henry T. Reath (argued), Michael M. Baylson, Peter J. Hoffman, Alexis J. Anderson, Duane, Morris & Heckscher, Philadelphia, Pa., for appellant Chase Bag Company.

H. Francis DeLone (argued), Mark A. Klugheit, Barbara P. Ianacone, Dechert, Price & Rhoads, Philadelphia, Pa., for appellant James K. Cooper.

Robert W. Sayre (argued), James G. Rosenberg, Stephen S. Aichele, Saul, Ewing, Remick & Saul, Philadelphia, Pa., for appellant Harrison B. Rue.

John H. Shenefield, Asst. Atty. Gen., Barry Grossman, Daniel J. Conway, Andrea Limmer (argued), Dept. of Justice, Washington, D. C., Walter L. Devany, Morton M. Fine, Donald C. Klawiter, James A. Back-

strom, Jr., Dept. of Justice, Philadelphia, Pa., for appellee.

Before SEITZ, Chief Judge, and HUNTER and GARTH, Circuit Judges.

## OPINION OF THE COURT

SEITZ, Chief Judge.

On October 29, 1976, a grand jury in the Eastern District of Pennsylvania returned a one-count indictment charging five corporations and seven individuals with conspiring "to raise, fix, maintain and stabilize the prices and terms and conditions of sale of consumer bags" in violation of section 1 of the Sherman Act, 15 U.S.C. § 1. The indicted corporations were Continental Group, Inc. (Continental), American Bag & Paper Corporation (American), Chase Bag Company (Chase Bag), Harley Corporation (Harley Corp.), and St. Regis Paper Company (St. Regis). The individual defendants were James K. Cooper (vice president and general manager of Continental's Flexible Packaging Division), Peter J. Weggeman (general sales manager of Continental's Flexible Packaging Division), David Mawicke (manager of paper product sales for Continental's Flexible Packing Division), Stanley A. Schottland (president of American), Harrison B. Rue (vice president of Chase Bag's Converting Division), William H. Versfelt (vice president and general divisional manager of St. Regis's Bag Packaging Division), and Edward W. Weikum (manager of converter sales and license relations in St. Regis's Bag Packaging Division).

As defined in the indictment, "consumer bags" are small, pre-formed paper containers used to package such products as pet foods, cookies, tea, coffee, kitty litter, chemicals, and agricultural products. The bags usually have printed exteriors designed as specified by the customer. They are often lined or coated. In addition to packages designed for consumer items, the term "consumer bags" also includes such coated paper containers as air sickness bags.

Prior to trial Harley Corp., American, and Schottland (American's president) pled nolo contendere. Beginning on September 30, 1977, the three remaining corporate defendants (Continental, Chase Bag, and St. Regis) and the six remaining individual defendants (Cooper, Weggeman, Mawicke, Rue, Versfelt, and Weikum) went to trial before a jury. At the close of the government's evidence, the district court granted motions for judgment of acquittal on behalf of Mawicke and Versfelt. After the close of all evidence the jury returned a verdict acquitting St. Regis, Weggeman, and Weikum and convicting Continental, Chase Bag, Cooper, and Rue.

After denying post-trial motions, the district court fined Continental $750,000 and fined Chase Bag $600,000. It sentenced both Cooper and Rue to four months imprisonment to be followed by thirty-two months probation. In addition, it fined Cooper $40,000 and fined Rue $30,000. These convictions and sentences form the basis of the present appeal.

## I

In its opinion on appellants' post-trial motions, the district court summarized the evidence presented at the 43-day trial. *See United States v. Continental Group, Inc.,* 456 F.Supp. 704, 708–14 (E.D.Pa.1978). Although we will examine portions of this evidence in some detail in considering each appellant's claim that the evidence was insufficient to support conviction, *see* Part II, *infra*, a brief overview of the alleged conspiracy will aid our analysis.

The government charged that various manufacturers of consumer bags had begun to conspire to fix prices as early as 1950. This conspiracy allegedly continued, despite changes in participants, until the indictment was returned in 1976. Significantly, the grand jury charged that the conspiracy extended beyond December 21, 1974, the effective date of an amendment making violation of section 1 of the Sherman Act a felony rather than a misdemeanor. Pub.L. 93–528, § 3, 88 Stat. 1708 (1974).

Of the indicted defendants, only American was alleged to have participated in 1950. Other companies alleged to have par-

ticipated in the 1950's, however, included Benjamin C. Betner Company (Betner) and Arkell & Smith Company (Arkell & Smith). Continental acquired Betner in 1953; Chase Bag acquired Arkell & Smith in 1967. Although testimony concerning the meetings held in the 1950's was sketchy, the record indicates that some discussion of prices did occur.

In 1960 or 1961 representatives of Continental, Bemis Bag Company (Bemis Bag), and Arkell & Smith allegedly met in New York to put together a price list to be used in pricing consumer bags. The list consisted of a loose-leaf binder breaking down the various components or "factors" of a job and assigning a price to each. Factors included such specifications as the amount and type of paper, the type of coating, and the amount of printing. When a potential customer asked one of the manufacturers to quote a price on a particular job, that manufacturer would bid by adding up the necessary factors from the list. Continental, American, Bemis Bag, and Arkell & Smith allegedly adopted this pricing format. Later entrants into the industry allegedly were encouraged to price from the list.

During the 1960's Continental, the largest manufacturer of consumer bags, assumed the role of "price leader." Semi-annual revisions in the price list, either single-factor or across-the-board, would be initiated by Continental, published in the Wall Street Journal, and mailed to competitors. These increases and their effective dates allegedly were cleared in advance at meetings attended by representatives of Continental, Arkell & Smith (Chase Bag after 1967), American, Harley Corp., and St. Regis. In 1971 these manufacturers all joined the Paper Sack Shipping Manufacturers' Association (PSSMA). That organization held semi-annual or quarterly meetings at resorts around the country. According to the government, the defendant corporations would gather during these conventions at informal meetings to discuss and set prices. The corporations and corporate personnel attending these meetings varied from meeting to meeting, as did the exact topics of conversation. These informal gatherings continued into 1976.

In support of its allegations that the defendants conspired to fix prices, the government introduced three types of evidence. First, it presented testimony by participants in the various meetings. Because of the long time frame and the large number of meetings, the government's witnesses often were unsure about who attended particular meetings or about what was discussed. Second, the government presented evidence of inter-defendant phone calls to compare prices on particular bids. The government contended that these calls were made to ensure that the conspirators were abiding by the price list. Defendants argued that the phone calls that did occur were made in order to support a "meeting competition" defense under the Robinson-Patman Act, 15 U.S.C. § 13(b). Finally, the government introduced economic testimony aimed at demonstrating that the defendants made parallel and nearly simultaneous changes in their price lists between 1970 and 1976. Defendants contended that these data were misleading, that all price changes were cost-justified for each manufacturer individually, and that any parallelism was the result of legitimate price leadership/followership.

Additionally, the defendants presented evidence allegedly demonstrating that the consumer bag industry was very competitive. An economist testified that the industry's low profit margin and other economic indicators belied any concerted effort to maintain prices at an artificially high level. Moreover, defendants and some of their customers testified that discounts from list prices were very common and very competitive.

## II

■ All the appellants argue that the government produced insufficient evidence to support their convictions. To the extent that they argue that *United States v. United States Gypsum Co.*, 438 U.S. 422, 98 S.Ct. 2864, 57 L.Ed.2d 854 (1978), requires proof of a conspiracy's anticompetitive effect and that the government failed to provide such

proof, we will treat that question in our consideration of *Gypsum*'s applicability to this case. *See* Part IV, *infra*. To the extent that each appellant asserts a general insufficiency of the evidence to prove the crime charged, we note that we must sustain the jury's verdict "if there is substantial evidence, viewed in the light most favorable to the Government, to uphold the jury's decision." *Burks v. United States*, 437 U.S. 1, 17, 98 S.Ct. 2141, 2150, 57 L.Ed.2d 1 (1978).

**A**

Continental contends that the evidence was insufficient for the jury to conclude that Continental had participated in the ongoing, twenty-six year conspiracy charged in the indictment.

Viewed in the light most favorable to the government, the evidence demonstrates that various manufacturers of consumer bags began to meet to discuss prices as early as 1951. These meetings took place several times a year up until 1971, the year that the manufacturers joined PSSMA. Early participants included representatives of Betner (Continental after 1953), American, Oneida Packaging Products (Oneida), Thomas M. Royal Co. (Royal), and Union Bag & Paper Co. (Union). Although the existence and extent of any agreement to fix prices during that early period is perhaps uncertain, Stanley Schottland testified that since 1950 American had followed price increases discussed at those meetings.

Continental's participation in the alleged conspiracy entered a new phase in 1961. According to Rose Loughrey, a price analyst for Continental, she received orders from George Buchanan, her supervisor, to attend a meeting with representatives of Bemis Bag and Arkell & Smith to develop a new price list for consumer bags. Buchanan told her that this list was to be used by Continental, American, Arkell & Smith, Bemis Bag, and Oneida. When Loughrey complained that such a meeting was illegal, Buchanan threatened her with dismissal. Loughrey attended the meeting and helped to develop the price list format. Some time

after she reported back to Buchanan, he told her that the list had been accepted without protest. On further orders, Loughrey published the list. About twice each year she would revise the list and arrange for its distribution.

Robert Harley testified that soon after Harley Corp. entered the consumer bag industry sometime in 1960 or 1961, he received an invitation from Fred Hinkle of Continental to attend a meeting in New York City. Harley believed that he received the invitation because he had refused to tell Rose Loughrey over the phone what price he was charging Perk Foods for consumer bags. At the meeting, attended by Hinkle and Buchanan of Continental, Pavitt of American, and two representatives of Arkell & Smith, Hinkle told Harley that Harley Corp. didn't have to sell its bags "at what we consider under a market price." Harley told the participants that he had "no intention of doing anything to destroy the pricing structure in the market place." Hinkle then provided Harley with Continental's list, which Harley Corp. used thereafter.

In 1962, Loughrey and Hinkle of Continental, Eugene Pavitt of American, and representatives of Arkell & Smith met at Pavitt's home. According to Loughrey, she, Hinkle, and the Arkell & Smith people sought Pavitt's approval for an increase in the prices of heat-sealed bags. Pavitt reluctantly agreed to such an increase, saying "if you do [raise the price] we will follow." Loughrey issued new lists reflecting the changes.

Although representatives of the various competitors continued to meet through the 1960's, the record contains little evidence of who participated or what was discussed at any particular meeting. The record does indicate, however, that during this period various representatives of the defendant companies frequently exchanged phone calls to compare prices. Continental claims that these calls were made only to verify a customer's report of a lower price quoted by a competitor. According to Loughrey, however, when a prospective customer asked

Continental for a bid, either she or Buchanan routinely would call competitors, ask if they had received a similar inquiry, and compare prices. Prior to 1961, Buchanan made the calls for large orders while Loughrey called for small orders. After 1961, Loughrey made almost all the calls herself. If the competitor's price was the same as that calculated by Loughrey, she would quote it to the customer. If they differed, she would consult her superiors before quoting a price.

In 1969, Pavitt of American hosted a meeting at the Philmont Country Club attended by George Landon and Fred Hinkle of Continental as well as representatives of Chase Bag and Harley Corp. Pavitt testified that Landon announced a three per cent price increase that Continental had made public a short while earlier. The advisability of such an increase was discussed by the participants, some of whom expressed surprise that Continental would commit itself to such an increase before the meeting. By the end of the meeting no one had expressed disagreement with a three per cent increase, and Pavitt left with the impression that all the participants had committed themselves to follow Continental's lead.

Similarly, Robert Harley described a meeting he hosted at Hilton Head Island, South Carolina, in January 1970. Landon of Continental stated that costs were increasing and that Continental was going to raise its prices. Harley responded that he was experiencing similar problems with costs and left with the impression that he had committed his company to mirror Continental's increase.

Prior to joining the PSSMA in 1971, Continental was represented at at least three other meetings where the participants discussed prices and industry conditions. During a golf outing at Tamarach Country Club in September 1970, Landon announced that Continental planned another three per cent increase effective January 1, 1971. Chase Bag and Harley Corp., whose representatives were present at Tamarach, thereafter implemented similar increases. In Spartansburg, South Carolina, in March 1971, the participants spoke generally about industry conditions and compared prices on certain types of bags. Finally, at Darien Country Club in May 1971, Continental and the other defendants agreed to join PSSMA.

Continental's representatives continued to meet with its competitors' representatives at informal "rump sessions" held at each PSSMA convention. Such sessions were held at Scottsdale, Arizona, in 1971, and at Boca Raton, Florida, and Chicago in 1972. The subjects discussed at these meetings, however, are unknown.

The first PSSMA-related meeting at which prices definitely were discussed was held at Tuckerstown, Bermuda, in October 1972. Landon and James Cooper (appellant in No. 78–2331) of Continental and Robert Harley of Harley Corp. hosted a breakfast meeting attended by representatives of St. Regis, American, and Union Camp. According to Harley, he and Landon accused Union Camp's Jack Bauman of undercutting certain prices quoted by Harley. Landon told Bauman that the other manufacturers would like to see "you people" use Continental's price list. Bauman responded that he would "take the matter under consideration."

In April 1973, at the PSSMA meeting in Atlanta, Landon of Continental told a group consisting of representatives of Harley Corp., Chase Bag, American, and St. Regis that Rose Loughrey had filed a discrimination suit against Continental and "had disclosed that this group of ours had been meeting, [and] named a lot of people and places." Harley then informed the group that his counsel had advised him to stop attending the rump sessions and to stop exchanging price information over the phone because such activities were illegal. Versfelt of St. Regis and Landon of Continental said that their attorneys had told them that the meetings were legal. Despite this discussion, the meetings continued and Harley continued to attend.

Later in 1973, at PSSMA's Pebble Beach convention, representatives of the defend-

ant corporations met in Landon's hotel room. In the course of discussing revisions in the price list, Landon indicated "that he wanted it known" that Continental was the price leader of the industry.

A particularly significant meeting was held at the Chicago PSSMA convention in June 1974. Cooper and Weggeman represented Continental, Harrison Rue (appellant in No. 78–2332) represented Chase Bag. Others present included Harley of Harley Corp., Schottland of American, and Versfelt and Weikum of St. Regis. According to Harley, at an earlier meeting in New Orleans Weikum had expressed St. Regis's dissatisfaction with the price list for pet food bags. At that time Cooper had responded that Continental "liked the price book the way it was." Nevertheless, in Chicago, Versfelt and Weikum again suggested that St. Regis wanted to develop its own list for pet food bags. Schottland of American heard Cooper respond, "this will be fine, be my guest" or "go ahead, do it, that sounds great." Harley told the St. Regis people that if they revised the price list "we would follow their list."

St. Regis issued a revised list to be effective December 30, 1974. Chase Bag and Harley Corp. issued pet food lists identical to St. Regis's effective in January 1975. While Continental and American did not publish new lists until February 1975, both companies used the St. Regis list to price pet food bags in the interim.

In September 1975 the PSSMA held a convention in Bermuda. While there Cooper of Continental invited Harley of Harley Corp. and Schottland, Abe Mendenhall, and Theodore Hughes of American to a breakfast meeting. Harley testified that Cooper had told him that the purpose of the meeting was to get Schottland to stop delaying a price increase. Because a grand jury had begun an investigation into the industry, Schottland told Mendenhall and Hughes before the meeting that "I'm sure that nobody would be that dumb to bring up anything

about prices, but if anybody does, for God's sake, don't open your mouth." According to Schottland, however, "[t]here was somebody that dumb."

Harley, Schottland, Mendenhall, and Hughes all testified as to what took place at the meeting. Cooper began by briefing them on the status of Rose Loughrey's lawsuit. He then announced that Continental intended to raise its prices by three per cent[1] effective January 1, 1976. He specifically stated that he had the support of "the others" for such an increase. Cooper asked both Harley and Schottland if their companies would support such an increase; both indicated that they would. Although each of the defendant companies seemed to pursue an independent course during the next few months, all eventually announced a three per cent increase effective January 1, 1976.

After the announcement of this increase, the defendant companies met resistance from Ralston Purina, a major purchaser of consumer bags. In January 1976, at a PSSMA convention in Palm Beach, Florida, Harley discussed Harley Corp.'s pricing policy for Ralston with Cooper of Continental, Rue of Chase Bag, Weikum of St. Regis, and Schottland of American. In particular, he told Cooper that Harley Corp. was going to delay increasing its prices to Ralston until February 15. Cooper told Harley that Continental was going to do the same. Harley then gave Cooper, Rue, and Schottland a piece of paper with the prices Ralston had resisted, "[t]o let them know that the prices on that sheet were the prices that were being developed from our price book."

In addition to the evidence of meetings and telephone calls, the record contains economic testimony demonstrating a high degree of parallelism in the timing and amount of price changes by the defendant companies between 1970 and 1975. The district court has tabulated some of this evidence in its opinion. *See* 456 F.Supp. at 724–25.

---

1. Schottland and Harley testified that Cooper announced a three per cent increase. Mendenhall and Hughes testified that Cooper men-
tioned a specific percentage, but they could not remember what it was.

■ After reviewing the evidence concerning Continental's participation in the alleged conspiracy, we agree with the district court that there was substantial, even overwhelming, evidence of Continental's guilt. We recognize that the government shouldered a heavy burden when it charged a continuing 26–year conspiracy, but we believe that the government produced sufficient evidence to go to the jury on this allegation. Moreover, we note that the breakfast meeting in Bermuda took place in September 1975, well after the effective date of the amendment making a violation of the Sherman Act a felony. This meeting provides sufficient evidence for a jury to conclude that Continental's participation in the conspiracy extended into the "felony period." [2]

**B**

■ Appellant James K. Cooper also argues that the government produced insufficient evidence to convict him of participation in the conspiracy charged. Cooper was general sales manager of Continental's Flexible Packaging Division from February 1970 to January 1974, and general manager of that division from January 1974 through 1976. In considering this contention we again stress that we must view the evidence in the light most favorable to the government. Moreover, we note that the government did not have to prove that Cooper participated in the conspiracy from its inception, but only that he knowingly became a member of the ongoing conspiracy. *See United States v. American Radiator & Standard Sanitary Corp.*, 433 F.2d 174, 182 (3d Cir. 1970), *cert. denied,* 401 U.S. 948, 91 S.Ct. 928, 28 L.Ed.2d 231 (1971).

During Cooper's tenure as general sales manager he served under George Landon and had no official authority to set the prices of consumer bags. Nevertheless, one facet of his job was supplying price information to Landon, who did have authority to set prices.

Testimony demonstrates that, prior to his promotion in 1974, Cooper accompanied Landon to various meetings identified as "conspiratorial" by the government. These meetings included the golf outing at Tamarach Country Club in September 1970 where Landon announced Continental's intention to increase its prices by three per cent. The evidence does not indicate, however, whether Cooper took any part in the ensuing discussion of prices.

Similarly, Cooper apparently accompanied Landon to meetings in Spartansburg, South Carolina (March 1971), Darien, Connecticut (May 1971), Tuckerstown, Bermuda (October 1972), Atlanta, Georgia (April 1973), and Pebble Beach, Florida (September 1973). As noted earlier, Landon spoke on behalf of Continental at each of these meetings while Cooper apparently took no active role.

At a meeting in New Orleans soon after his promotion to general manager, Cooper told representatives of St. Regis who were dissatisfied with the pet food price list that Continental liked the list the way it was. In June 1974 at a meeting in Chicago, the St. Regis representatives again voiced dissatisfaction with the list and announced that they were going to revise it. Cooper responded that "this will be fine, be my guest" or "go ahead, do it, that sounds great." Thereafter, Continental adopted the new list issued by St. Regis.

Cooper also presided at the breakfast meeting in Bermuda in September 1975. All four of the other men present, Schottland, Mendenhall, Hughes, and Harley, testified that Cooper sought Schottland's agreement to a three per cent increase, *see* note 1, *supra,* and that Cooper stated that he had the support of "the others" for this increase. Continental did, in fact, increase its prices by three per cent, as did each of the other defendant companies.

---

**2.** Appellants contend that the government was obligated to prove an overt act by each defendant in furtherance of the conspiracy during the felony period. We need not decide here wheth-

er this contention is correct. *But see United States v. United States Gypsum Co.,* 600 F.2d 414, 417–20 (3d Cir. 1979).

Between 1974 and 1976, Cooper also participated in the exchange of price information with Continental's competitors. Thus, in 1974 or 1975 he assisted Harley in obtaining the price that Continental was charging Keebler Cookies. During that same period Cooper called Hughes to find out whether American was going to sell "on list" in upcoming bids to Ralston Purina, Carnation, and American Airlines. Finally, in January 1976, he discussed with Harley, Rue, Weikum, and Schottland the prices that Harley Corp. was going to charge Ralston Purina after the most recent revision of the list.

Cooper argues that he introduced overwhelming evidence that any price increases made by Continental during his tenure as general manager were carefully planned responses to Continental's own corporate needs. Such internal planning, he argues, belies any conspiracy among competitors. We believe, however, that this question was for the jury to decide. Cooper forcefully argued this theory before them. Moreover, even if the evidence cited by Cooper did, in fact, prove overwhelmingly that Continental's pricing decisions were the product of internal corporate forces, such evidence would not rule out the conspiracy alleged by the government. We need only note that Continental was the self-professed "price leader," and that this role might well have permitted Continental to propose price increases that were best suited to its own corporate needs.

We conclude that there was substantial evidence to support the jury's conclusion that Cooper knowingly joined the ongoing conspiracy.

### C

Appellant Chase Bag did not enter the consumer-bag industry until August 18, 1967, when it acquired Arkell & Smith, one of the originators of the price-list format. According to Rose Loughrey of Continental, Hinkle told her at that time that the new owners of Arkell & Smith did not want to exchange price information with Continental. As a result, Loughrey, refrained for a while from calling her contacts at Arkell/Chase. Within six to eight months, however, Chase Bag employees began to call her for prices and she resumed her normal exchange of information.

No Chase Bag representative attended any meeting of consumer-bag manufacturers until the summer of 1969, when a number of the alleged conspirators gathered at Seaview Country Club to meet Stanley Schottland, Eugene Pavitt's successor as president of American. Chase Bag was represented by Eugene Alexander, Chase Bag's product manager, and Frederick Kiendl, a former employee of Arkell & Smith who had been put in charge of Chase Bag's sales of "coated paper." Although prior to the takeover in 1967 Kiendl had controlled the pricing of consumer bags for Arkell & Smith, neither Kiendl nor Alexander had authority to price bags for Chase Bag. Both did, however, have "input" into the pricing decision. Apparently no price discussions occurred at the Seaview meeting.

Alexander hosted the golf outing at Tamarach Country Club in September 1970, in which Kiendl also participated. At that outing Landon of Continental announced that his company planned a three per cent increase effective January 1, 1971. Chase Bag subsequently enacted a similar increase.

In May 1971, Alexander and Kiendl attended the meeting at Darien Country Club along with James Wells, then vice president of Chase Bag, who did have authority to set prices. Although the participants at Darien apparently discussed the legality of their meetings and decided to join PSSMA, of which Chase Bag was already a member, no other price discussions occurred.

In April 1973, at the PSSMA meeting in Atlanta, Kiendl and Harrison Rue, who by that time had pricing authority, heard Landon of Continental report on Rose Loughrey's discrimination suit. Robert Harley again raised the question of the legality of the meetings.

The first active participation in such meetings by a Chase Bag employee apparently occurred at the Kansas City meeting in June 1973. Rue and Kiendl of Chase Bag, Cooper of Continental, Pavitt and Schottland of American and representatives of Harley Corp. and St. Regis met in Schottland's suite for dinner. Pavitt was upset because a competitor had cut ten per cent off the list price American had quoted to Safeway Stores. Rue conceded that Chase Bag had given the discount, and an argument erupted between Rue and Pavitt.

Chase representatives also attended rump sessions in September 1973 at Pebble Beach (Rue), in January 1974 at Palm Beach (Alexander), and in April 1974 in New Orleans (Rue and Kiendl). Although prices were discussed at each of these meetings, the record does not indicate the extent to which Chase Bag's representatives participated in these discussions.

Rue and Kiendl were present at the Chicago meeting in June 1974 when St. Regis's representatives announced their intention to formulate a new price list for pet food bags. Harley testified that prior to the meeting he had called Schottland of American to find out why Schottland had not raised American's prices to Ralston Purina. According to Harley, "Stanley liked to say he was going to move his prices up with the rest of us, but he would always play some delayed action at some of his pet accounts." At the meeting Rue made derogatory remarks about Schottland's pricing policies and Schottland stormed out of the room.

At the same meeting Harley told the St. Regis people that if they revised the pet-food list Harley Corp. would follow it. Moreover, he testified that after the meeting he discussed St. Regis's proposal with Rue and that Rue stated that Chase Bag "was going to follow it too . . . ." As noted earlier, St. Regis issued its new list on December 30, 1974. The files of Chase Bag contained an identical list with Chase Bag's named on it with a date of January 2, 1975. And by January 24, 1975, Chase Bag's relevant prices were the same as those on the St. Regis list.

Kiendl of Chase Bag attended a dinner meeting in January 1975 on Marco Island, Florida. At the meeting he continued the feud between Chase Bag and American when he got into a heated argument with Schottland. According to Schottland, Kiendl felt "that American was not putting its prices up with the important customers on what [Kiendl] considered to be the proper time, in terms of material increases."

No representative of Chase Bag attended the September 1975 breakfast meeting in Bermuda where Cooper of Continental solicited and received Harley's and Schottland's agreement to a three per cent increase effective January 1, 1976. Nevertheless, Cooper did say that he had the approval of "the others" for the increase. In fact, Chase Bag thereafter enacted such an increase in January 1976.

Finally, Rue of Chase Bag called Harley in December 1975 to ask him what prices Harley Corp. was going to charge Ralston Purina after the January price increase became effective. Later, at the January 1976 meeting in Palm Beach, Harley gave Rue, Cooper, and Schottland a piece of paper bearing the prices he had quoted to Ralston.

Chase Bag argues strenuously that this evidence was insufficient to convict it of the crime charged. It contends that the timing of all its price increases was completely consistent with its role as a price follower. Moreover, Chase Bag argues that the behavior of its representatives at the various meetings and rump sessions was perfectly consistent with innocence.

Were it not for the incident involving the St. Regis price list, we might be inclined to agree that the government failed to carry its burden of proof. That incident, however, convinces us that the district court did not err in allowing the charge against Chase Bag to go to the jury. As noted earlier, Harley testified that in June 1974 Rue committed Chase Bag to the then-unpublished St. Regis list for pet-food bags. Chase Bag did, in fact, adopt an identical list in January 1975. Significantly, this adoption took place after December 21, 1974, and thus within the felony period. *But see* note 2, *supra*.

Recognizing the importance of the St. Regis incident, Chase Bag suggests several reasons why we should discount that evidence. First, it argues that Harley's testimony is completely implausible because Rue would never have committed Chase Bag to a price list he had not seen. We note, however, that such a commitment is not implausible if Rue had reason to believe that the other manufacturers also would adopt the St. Regis list. Harley's testimony is thus quite consistent with the conspiracy charged by the government.

Second, Chase Bag argues that St. Regis did not issue its list until December 30, 1974, that the list in Chase Bag's file had a date of January 2, 1975, and that this time span is so short as to belie any inference of reliance on the St. Regis list. We believe, however, that the jury was entitled to draw the opposite conclusion: that the short time span implies a prior commitment to adopt the list.

■ Third, Chase Bag argues that the jury's acquittal of Weikum and St. Regis demonstrates that they did not believe Harley's account of the incident. Jury verdicts, of course, need not be internally consistent. *See, e. g., Dunn v. United States,* 284 U.S. 390, 393, 52 S.Ct. 189, 76 L.Ed. 356 (1982). Moreover, it was Rue of Chase Bag, and not Weikum or any other representative of St. Regis, who expressed a commitment to Harley to follow the St. Regis list. Thus the acquittal of Weikum and St. Regis does not necessarily indicate that the jury rejected Harley's testimony about the incident.

Finally, and quite correctly, Chase Bag argues that it was not charged with conspiring with Harley Corp. in 1974 to fix the price of pet food bags, but rather with joining an ongoing, 26–year conspiracy to fix the prices of consumer bags. Had the St. Regis incident been the only evidence against Chase Bag, we might agree that the government's proof varied substantially from the indictment. We note, however, that Chase Bag's participation in various meetings where prices were discussed, its exchange of price information with competitors, and its parallel pricing policies, al-

though perhaps innocent by themselves, are cast in a different light by Rue's apparent agreement with Harley to fix prices.

■ Confronted with this evidence of express agreement, we believe that the jury was entitled to infer that Chase Bag's participation in other "conspiratorial" activities was not wholly innocent and that it knowingly joined the ongoing conspiracy.

**D**

On February 12, 1972, appellant Harrison B. Rue became vice president of sales for Chase Bag, a position which he retained through 1976. Like the other appellants, Rue asserts that the government failed to produce sufficient evidence to support his conviction.

Given the foregoing discussion, the evidence against Rue can be summarized rather briefly. He represented Chase Bag at the meetings held in April 1973 in Atlanta, in June 1973 in Kansas City, in September 1973 in Pebble Beach, in April 1974 in New Orleans, in June 1974 in Chicago, and in January 1976 in Palm Beach. At two of those meetings (Kansas City and Chicago), he argued about pricing policy with representatives of American. He controlled Chase Bag's price list for consumer bags from 1972 through 1976, a period during which Chase Bag's price movements were demonstrably parallel to the movements of the other alleged conspirators. Moreover, according to Harley's testimony, Rue expressly agreed in June 1974 that Chase Bag would adopt the St. Regis price list for pet food bags when it was published. Chase Bag did, in fact, adopt a list identical to the St. Regis list.

■ Like Chase Bag, Rue argues that the St. Regis incident is not probative of his guilt. We conclude, however, that this agreement, when combined with the other evidence of arguably conspiratorial activities, constitutes substantial evidence supporting the jury's verdict as to Rue.

## III

The appellants contend that their convictions must be reversed and a new trial granted because the district court erred in permitting the jury to consider hearsay declarations and actions of alleged coconspirators against all the defendants without first making a finding that the government had established the existence of the alleged conspiracy and the participation therein of each defendant and alleged coconspirator by a preponderance of independent evidence. *See* Fed.R.Evid. rule 801(d)(2)(E) ("A statement is not hearsay if . . . [t]he statement is offered against a party and is . . . a statement by a coconspirator of a party during the course and in furtherance of the conspiracy."). They also contend that the district court abused its discretion in refusing to require the government to establish the existence of the conspiracy charged and the participation therein of each defendant by a preponderance of independent evidence before introducing any hearsay attributed to other members of the alleged conspiracy.

We will deal with the latter contention first. Appellants concede, as they must, that the control of the order of proof at trial is a matter committed to the discretion of the trial judge. *See Geders v. United States*, 425 U.S. 80, 86, 96 S.Ct. 1330, 47 L.Ed.2d 592 (1976); *United States v. American Radiator & Standard Sanitary Corp.*, *supra*, 433 F.2d at 195. In *American Radiator*, this court recognized that the order-of-proof problem confronting the trial judge is a particularly difficult one where the government is attempting to prove the participation of multiple defendants in a continuing conspiracy. *Id.*

In this case, the district court initially determined that it would permit the government to introduce into evidence otherwise inadmissible declarations of alleged coconspirators "subject to the obligation of the Government, before the case is completed, to establish the existence of the conspiracy and prove aliunde as to every separate defendant." This court approved the procedure outlined by the district court in this case in *United States v. Bey*, 437 F.2d 188, 191 (3d Cir. 1971), in which the following passage from an opinion of the Second Circuit Court of Appeals was quoted with approval:

> While the practicalities of a conspiracy trial may require that hearsay be admitted "subject to connection," the judge must determine, when all the evidence is in, whether in his view the prosecution has proved participation in the conspiracy, by the defendant against whom the hearsay is offered, by a fair preponderance of the evidence independent of the hearsay utterances.

*United States v. Geaney*, 417 F.2d 1116, 1120 (2d Cir. 1969), *cert. denied*, 397 U.S. 1028, 90 S.Ct. 1276, 25 L.Ed.2d 539 (1970).

This court has recognized that there is a real danger in a conspiracy trial involving numerous defendants that the jury may find a particular defendant guilty merely because of his association with the other defendants. *See United States v. American Radiator & Standard Sanitary Corp., supra* at 195. One aspect of this danger is that the trial judge, after admitting hearsay declarations of alleged coconspirators subject to later connection, may find at the close of all the evidence that the government has not borne its burden of proving by independent evidence that those declarations were made during the course and in furtherance of a conspiracy joined in by both the defendant and the declarant. Cautionary instructions to the jury might not suffice to cure the resulting prejudice to the defendant. *See Krulewitch v. United States*, 336 U.S. 440, 453, 69 S.Ct. 716, 93 L.Ed. 790 (1949) (Jackson, J., concurring). In such instances it may be necessary for the trial judge to grant a defendant's request for a mistrial. *See United States v. Bey, supra* at 191, *quoting United States v. Geaney, supra* at 1120.

Recognizing these problems, some appellate courts have indicated their preference that, "whenever reasonably practicable" or "whenever possible," the trial court should require the government to prove the existence of the conspiracy and each de-

fendant's connection with it by independent evidence before admitting hearsay declarations of an alleged coconspirator. *See United States v. James*, 590 F.2d 575, 582 (5th Cir.) (en banc), *cert. denied*, —— U.S. ——, 99 S.Ct. 2836, 61 L.Ed.2d 283 (1979); *United States v. Macklin*, 573 F.2d 1046, 1049 n.3 (8th Cir.), *cert. denied*, 439 U.S. 852, 99 S.Ct. 160, 58 L.Ed.2d 157 (1978). We agree that the danger of prejudice to the defendant inherent in the practice of admitting coconspirator declarations, otherwise hearsay, subject to later proof of the requisite conspiracy, dictates that the practice be carefully considered and sparingly utilized by the district courts. Nonetheless, given the large amount of interrelated testimony to be considered in this case, we believe that alternative approaches may have been unduly complex and confusing to the jury or to the court. We therefore conclude that the district court's decision to admit such declarations "subject to later connection" was not inconsistent with the sound exercise of its discretion.

■ The appellants have placed greater reliance on what they characterize as the district court's failure to make a finding, before submitting this case to the jury, that the government had, in fact, established the existence of the alleged conspiracy and the connection of each defendant with it by a clear preponderance of evidence independent of the hearsay declarations. Absent such a finding it would have been error for the court to have submitted the case to the jury without cautionary instructions limiting the use of hearsay statements as to particular defendants. *See United States v. Trowery*, 542 F.2d 623 (3d Cir. 1976) (per curiam), *cert. denied*, 429 U.S. 1104, 97 S.Ct. 1132, 51 L.Ed.2d 555 (1977); *United States v. Bey, supra.*

Appellants' position is that the trial judge in this case abdicated his responsibility under *Trowery* and *Bey* and allowed the jury to make the determination as to whether the government had established sufficient independent evidence of the conspiracy. We disagree with the appellants' characterization of the district court's actions.

■ Following the close of the prosecution's case, appellants Continental, Chase Bag, and Rue filed motions to strike the hearsay testimony of government witnesses against each of them for failure of the government to prove the existence of the conspiracy and their connection with it by a preponderance of independent evidence. The appellants' motions and Chase Bag's memorandum of law in support of its motion explicitly brought the decision in *Trowery* on the government's burden of proof to the district court's attention. It appears obvious to us that when those motions were denied, in an order entered on November 3, 1977, the district court implicitly found that the government had met its burden under *Trowery* and *Bey*. There is no requirement in either of those opinions that the trial judge enter specific findings of fact supporting his conclusion that a clear preponderance of independent evidence has been presented establishing a conspiratorial relationship between the hearsay declarant and each of the defendants.

A long line of authority in the Second Circuit supports our conclusion that the denial of the appellants' motion to strike constituted a finding by the court that the government had met its burden under *Trowery*. *See, e. g., United States v. Green*, 523 F.2d 229, 233 n.4 (2d Cir. 1975), *cert. denied*, 423 U.S. 1074, 96 S.Ct. 858, 47 L.Ed.2d 84 (1976) ("If the judge does allow the jury to consider the out-of-court statements, we must assume that he made the necessary finding and our only task is to decide if he had reasonable grounds for doing so."); *United States v. Baker*, 419 F.2d 83, 88–89 (2d Cir. 1969), *cert. denied*, 397 U.S. 976, 90 S.Ct. 1086, 25 L.Ed.2d 265 (1970) (denial of a motion for acquittal on conspiracy charge constitutes a determination that there was sufficient independent evidence to justify admission of hearsay declarations of coconspirators); *United States v. Geaney, supra* at 1120 ("we must assume on appeal that the trial judge was satisfied of the existence of a conspiracy on the basis of non-hearsay evidence.").

Appellants suggest that the foregoing authority has been undermined by the more recent opinion of the Second Circuit Court of Appeals in *United States v. Ziegler*, 583 F.2d 77 (2d Cir. 1978). In *Ziegler* the trial judge had "admitted all proffered declarations of co-conspirators subject to connection, without at any time making any preliminary finding based on non-hearsay evidence, that the conspiratorial relationship between the witness [*sic*] and the appellant had been sufficiently established by independent evidence *aliunde* to warrant admission of such declarations." *Id.* at 80–81 (footnotes omitted). That omission was *found to constitute harmful error. Ziegler* was a case, however, in which the trial judge explicitly refused to comply with applicable Second Circuit precedent because he disagreed with it. Thus, the *Ziegler* court distinguished the cases relied upon here that hold that the requisite finding can be inferred from the court's submission of the evidence to the jury: "Where, as here, the district judge declines to make the determination when asked to do so and expresses his disagreement with controlling Second Circuit precedent, we must resolve any remaining ambiguity in favor of the accused." *Id.* at 80 n.5. In this case the district court made the requisite determination when asked to do so by denying the appellants' motions to strike the hearsay testimony.

The appellants assert that the district court's denial of their motions to strike did not constitute the findings required by *Trowery* and *Bey*, that the court impermissibly left that finding for the jury's consideration, and that the truth of their assertions is demonstrated by the court's charge to the jury and by the court's opinion accompanying the order denying their post-trial motions for judgment of acquittal and a new trial.

In charging the jury, the district court employed one of the government's requested instructions:

Now whether or not therefore any particular defendant was a member of or participated in a common plan in determining as to that defendant that involvement can only be established beyond a reasonable doubt by evidence as to that defendant's own conduct; that is, what that defendant himself said or did. If it appears beyond a reasonable doubt from the evidence that a common plan did exist and that a defendant was one of its members, then the act knowingly done and the statements knowingly made by any other person likewise found to be a conspirator may be considered by you as evidence in the case to each defendant found to be a member, even though the act done and the statements made occurred in the absence and without the knowledge of an absent defendant, provided that the acts done or the statements made were during the existence of a common plan and in furtherance of the purpose and objectives of the plan.

To summarize, you may not use a statement made by any of the alleged conspirators against the particular defendant to prove that that defendant was a member of the plan or conspiracy. Membership by an individual defendant or a corporate defendant must be proved by the acts or statements of that defendant himself or itself but if membership has been so proved thereafter you may consider the acts and statements of any other member of the conspiracy against a particular defendant so found to be a member and so long as he remains in the conspiracy, provided the acts and the statements were during the continuance of the plan and conspiracy in furtherance of it.

Appendix at 400–01.

It is true, of course, that the instruction given the jury on the sufficiency of independent evidence was superfluous. In *Trowery* this Court held:

If the evidence is admitted, it then goes to the jury without special instruction. The issue of concert of action, as it applies to the question of admissibility of evidence, is determined by the trial judge as a matter of law, rather than being submitted to the jury.

542 F.2d at 627. In this regard, *Trowery* reiterated the earlier holding in *Bey*:

Nor was it necessary for the trial court to instruct the jury to consider the [hearsay] statement only if it found independent evidence of the conspiracy. Once the judge has made the initial determination of admissibility, the jury should not be given an opportunity to second-guess his decision.

437 F.2d at 191–92.

No court has held, however, that an instruction that gives the jury an opportunity to second-guess the court's decision to admit coconspirator declarations, otherwise inadmissible as hearsay, is reversible error prejudicing the defendant. To the contrary, it has been generally held that, so long as the court fulfills its responsibility to make the initial determination, such a charge only provides a windfall to the defendant. *See, e. g., United States v. Enright,* 579 F.2d 980, 987 (6th Cir. 1978); *United States v. Smith,* 578 F.2d 1227, 1233 (8th Cir. 1978); *United States v. Petrozziello,* 548 F.2d 20, 23 (1st Cir. 1977).

Despite their present reliance on the court's charge as evidence of the trial judge's abdication of his responsibility under *Trowery* and *Bey,* the defendants did not object to that charge after it was given. Moreover, an additional factor buttressing our conclusion that the charge lends no support to the appellants' claim of reversible error is that Chase Bag itself asked that such a charge be given. In its requested points for charge, modifying those submitted by the defendants jointly, Chase Bag requested that the jury be instructed:

Chase cannot be convicted of being a member of the conspiracy unless you are satisfied that the government proved beyond a reasonable doubt by independent first-hand testimony that Chase joined the conspiracy. Mere out-of-court statements by others who did not testify is not sufficient to prove that Chase joined the conspiracy.

In a footnote to that request Chase Bag stated:

This requested point appears to be in conflict with the Third Circuit's decisions in *United States v. Trowery,* 542 F.2d 623 (3d Cir. 1976). Chase, however, asserts that without this point it is being subjected to trial with a standard of proof less than "beyond a reasonable doubt." Chase, therefore, reserves its rights in this regard.

Appendix at 310. Our examination of the record convinces us that the appellants suffered no prejudice from the court's instruction to the jury concerning independent evidence of the conspiracy.

Appellants also rely on the district court's post-trial opinion as evidence that the court abdicated its responsibility under *Trowery.* In the appellants' joint motion for a new trial they asserted that the district court had erred in denying their pre-trial motion to regulate the order of proof, in admitting testimony at trial containing hearsay, and in denying their motions to strike that testimony. In its opinion denying their motion, the court stated:

In the instant case, the Court did not abuse its discretion to permit the Government to introduce hearsay statements of alleged coconspirators subject to their later connection with the conspiracy by clear, independent evidence, because the evidence in this case clearly was sufficient for the jury to find beyond a reasonable doubt that a conspiracy existed and that each of the defendants knowingly joined and participated in that conspiracy during the felony period.

456 F.Supp. at 720. We believe that this statement must be read in the total context of the district court's opinion. In an earlier passage, the district court accurately summarized this court's holding in *Trowery,* stating that the case

enunciated the well-settled rule . . . that to determine whether statements of an alleged coconspirator are competent against the non-declarant, the trial judge must determine whether it has been proved, by a clear preponderance of the evidence independent of the hearsay statement, that a joint undertaking existed at the time of the statement or action and that the declarant was a participant.

*Id.* Thus, contrary to the appellants' assertions, the district court's opinion does not demonstrate confusion on the part of the trial judge about *Trowery*'s requirements as to the role of the court and the jury on this issue. Rather, the court's opinion, viewed in its entirety, must be read as holding that, not only was there a clear preponderance of independent evidence from which the judge had found the requisite conspiratorial relationship, but also that there was sufficient evidence for the jury to have found beyond a reasonable doubt that such a relationship existed.

 Although the better practice is for the district court to place in the record an explicit *Trowery* ruling accompanied by such exposition as seems appropriate under the circumstances, we believe that the district court in this case was aware of its responsibilities under *Trowery* and *Bey.* Furthermore, we believe that the district court made an explicit finding when it denied the appellants' motions to strike hearsay testimony, that there was a clear preponderance of non-hearsay evidence establishing the existence of a conspiracy and the participation of each of the defendants and declarants therein. Under such circumstances, the court's later instruction to the jury directing them not to consider hearsay declarations against any defendant unless they were first satisfied, beyond a reasonable doubt and based on independent evidence, of that defendant's participation in a joint venture with the declarant, was, at worst, harmless error.

 It only remains for this court to consider whether the district court "had reasonable grounds" to make such a finding. *United States v. Bey, supra,* at 191. In making this determination, we note that, with a few minor exceptions,[3] the facts considered in the discussion of each appellant's challenge to the sufficiency of the evidence are supported by evidence independent as to that appellant. Testimony

relating statements made by a particular defendant—or, in the case of corporate defendants, by their agents—are admissible against that defendant without resort to the coconspirator exception. *See* Fed.R. Evid. 801(d)(2)(A) & (D). Moreover, a number of the statements attributed to persons other than the defendants were not admitted for the truth of the declaration, and therefore do not constitute hearsay at all. *See* Fed.R.Evid. 801(c). Given the testimony of prosecution witnesses that they participated in the alleged conspiracy, and given the non-hearsay evidence linking each appellant with that conspiracy, we conclude that the district court did not err in admitting all coconspirators' statements against all the appellants.

## IV

Appellants challenge various aspects of the instructions delivered to the jury by the district court. Most significant, they have challenged the instructions on intent and on withdrawal from the conspiracy.

## A

Appellants advance three arguments in support of their contention that the district court erroneously instructed the jury on the issue of intent. First, they argue that because violations of the Sherman Act are now felonies, *see* Pub.L. 93–528, § 3, 88 Stat. 1708 (1974), the district court erred in refusing to require a finding of specific intent to bring about anticompetitive effects. Second, they argue that *United States v. United States Gypsum Co.,* 438 U.S. 422, 98 S.Ct. 2864, 57 L.Ed.2d 854 (1978), controls this case and renders the district court's instructions on intent erroneous. Third, they argue that one portion of the district court's charge allowed the jury to return a verdict of guilty without any finding of intent whatsoever.

---

3. The most notable exception is Cooper's alleged statement at the breakfast in Bermuda that he had the support of "the others" for a three per cent increase. Although this statement appears to be hearsay as to Chase Bag

and Rue, we believe that the remaining, independent evidence against those defendants is sufficient to support the district court's decision under *Trowery.*

### 1

The Supreme Court has rejected the claim that conviction of a misdemeanor violation of the Sherman Act requires a finding of specific intent or purpose to produce anticompetitive effects. *See United States v. United States Gypsum Co., supra,* at 444 & n.21, 98 S.Ct. 2864. Nevertheless, appellants contend that the government must be held to this higher standard now that the crime charged is a felony.

 Certainly nothing in the legislative history of the 1974 amendment to the Sherman Act indicates any Congressional intention to alter the mens rea necessary for conviction. In fact, all indications are that, despite the increase in penalties, Congress intended that "[n]o change would be made in the substantive antitrust law itself." 120 Cong. Rec. 36340 (Nov. 19, 1974) (statement of Congressman Hutchinson). Nor are we persuaded that the absence of a showing of specific intent denies the appellants due process of law. *See United States v. Foley,* 598 F.2d 1323, 1335–36 (4th Cir. 1979). We conclude, therefore, that conviction of a felony for violating the Sherman Act does not require a showing of specific intent to produce anticompetitive effects. *Accord United States v. Foley, supra; United States v. Noll Manufacturing Co.,* 1977–2 Trade Cas. ¶ 61,712 (N.D.Cal.1977).

### 2

Alternatively, appellants argue that the Supreme Court's decision in *United States v. United States Gypsum Co.,* 438 U.S. 422, 98 S.Ct. 2864 (1978), necessitates reversal of their convictions. In *Gypsum,* handed down seven months after the jury returned its verdict in this case, the Court rejected an instruction that allowed the jury to convict defendants of violating the Sherman Act if the jury concluded that the exchange of prices among the defendants had an unreasonable anticompetitive effect, regardless of the defendants' knowledge of or desire for that effect. The district court had instructed:

> The law presumes that a person intends the necessary and natural consequences of his acts. Therefore, if the effect of the exchanges of pricing information was to raise, fix, maintain, and stabilize prices, then the parties to them are presumed, as a matter of law, to have intended that result.

*Id.* at 430, 98 S.Ct. at 2869. The Supreme Court held that the Sherman Act did not create a strict-liability crime, and that the prosecution was required to prove either (1) that defendants knew of the probable anticompetitive effects of their actions, which effects actually occurred, or (2) that defendants acted with the conscious purpose of producing anticompetitive effects, whether or not those effects actually occurred. *Id.* at 444 & n.21, 98 S.Ct. 2864.

Appellants allege that *Gypsum*'s standards apply to this case and that the district court erred in failing to instruct the jury in those terms. Moreover, appellants contend that the government's alleged failure to introduce any evidence of actual anticompetitive effects entitles them to judgments of acquittal under *Gypsum*'s standards. In considering these claims we first must determine what level of intent must be proven where the defendants are charged with price fixing; we then must evaluate the district court's instructions and the government's evidence against that standard.

In *United States v. Gillen,* 599 F.2d 541 (3d Cir. 1979), this court held that *Gypsum* did not alter the "long-established rule of law on price-fixing cases" that proof of the requisite mens rea is satisfied by proof that the defendant formed or joined a conspiracy to fix prices. *Id.,* at 545. We noted that in *Gypsum* the conduct described in the challenged instruction, exchanging prices, was not a per se violation of the Sherman Act. Instead, it might have fallen within "the gray zone of socially acceptable and economically justifiable business conduct." 438 U.S. at 441, 98 S.Ct. at 2875. Gillen, on the other hand, stood accused of price fixing, "an area of the law in which people either can or ought to be able to predict the legal consequences of their actions." *United States v. Gillen, supra,* at 544.

 It is important to note, as did the Supreme Court in *Gypsum,* that conspiracy cases actually involve two types of intent, the intent to agree and the intent to effectuate the object of the agreement. *See* 438 U.S. at 443 n.20, 98 S.Ct. 2864. Clearly, it is not sufficient for the government to prove that the defendants agreed to do something; agreement itself is not illegal. Instead, the government must prove that the defendants agreed to effectuate an illegal purpose, *e. g.,* to fix prices. This illustrates the crucial distinction between *Gypsum* and *Gillen.* An agreement to exchange prices, by itself, is not illegal; an agreement to fix prices is.[4]

This case, like *Gillen,* involves a conspiracy to fix prices. Nevertheless, appellants suggest two reasons why *Gillen* might be distinguishable. First, they argue that in *Gillen* the evidence of a conspiracy was overwhelming and that the only real issue was whether the defendant had joined that conspiracy. *See United States v. Gillen, supra,* at 546. In this case, they argue, the existence of a price-fixing conspiracy was fiercely contested below. But we fail to see what effect the amount of proof can have upon the standard of proof. Although the existence of a price-fixing conspiracy may have been indisputable in *Gillen,* the government was still required to meet its burden of proving that Gillen had knowingly agreed to fix prices. *See id.* at 545–46.

Alternatively, appellants note that *Gillen* was a nonjury trial and that the issue presented to this court was the sufficiency of the district court's findings of fact rather than the sufficiency of jury instructions. Again, we fail to see what effect this fact should have upon the rule announced in *Gillen.* Whether the ultimate fact-finder is a judge or a jury, the legal standards remain the same.

 Because we believe that *Gillen* controls this case, the inquiry becomes whether the district court adequately instructed the jury that the government had to prove that defendants knowingly joined or formed a conspiracy to raise, fix, stabilize, or maintain prices. *Accord, United States v. Brighton Building & Maintenance Co.,* 598 F.2d 1101, 1106 (7th Cir. 1979). Our examination of the district court's instructions convinces us that they do satisfy this requirement. A few examples from the charge will illustrate this conformity:

> [T]his indictment charges that . . . the defendants and other co-conspirators engaged in a single combination and conspiracy in unreasonable restraint of trade and commerce . . . and that this combination and conspiracy consisted of a continuing agreement, understanding and concert of action among the defendants . . . the substantial terms of which are to raise, to fix, maintain and stabilize prices and terms, conditions of sale of consumer bags.

> \* \* \* \* \* \*

> To create [a conspiracy] two or more persons must enter into a mutual agreement or understanding that they will act together for an unlawful purpose or to accomplish a lawful purpose by an illegal means. In the absence of an agreement or mutual understanding or meeting of the minds there can be no conspiracy.

> \* \* \* \* \* \*

> What must be proved beyond a reasonable doubt is that the alleged conspiracy was knowingly formed and that two or more persons including one or more of the defendants on trial now knowingly became members of the conspiracy charged in the indictment.

> \* \* \* \* \* \*

4. Appellants argue that the distinction drawn in *Gillen* is erroneous because the defendants in *Gypsum* also were accused of conspiring to fix prices. *See* 438 U.S. at 427, 98 S.Ct. 2864. This argument fails to recognize the narrow focus of the Supreme Court's opinion in *Gypsum.* The district court's instructions in that case allowed the jury to convict the defendants if the jury concluded that there was an agreement to exchange price information and that such exchanges had the effect of stabilizing prices. This instruction rendered the indictment and the government's theory of the case irrelevant.

[B]efore you may find that the defendants became a member of the conspiracy charged the evidence must show beyond a reasonable doubt, first, that the conspiracy was knowingly formed; secondly, that the defendants knowingly participated in a conspiracy with the intent to further or advance some objective or purpose of the conspiracy. This latter requirement is satisfied if the evidence consisting of that defendant's own statements and conduct shows beyond a reasonable doubt a knowing assistance of any kind in effectuating the objective of the conspiracy.

\* \* \* \* \* \*

It is not necessary for the prosecution to prove knowledge by a defendant that a particular statute or act or provision of law was an object of this conspiracy. If you find as jurors in this case beyond a reasonable doubt that the conspiracy charged was formed in the manner that I have mentioned on the basis of the evidence, if you find it was knowingly formed for the purposes outlined in the indictment, and that a defendant or any defendant thereafter knowingly by his own statements or conduct became a member of the conspiracy, then it would be as I have outlined in summary up to this point your duty to consider that defendant guilty of the crime charged.

On the other hand, if you find either that the conspiracy was not knowingly formed or even though formed that a defendant by his own or its own statements or conduct became a member, if you should fail to find either of those, then you should return a verdict of not guilty.

Reading the charge as a whole, we believe that the district court adequately instructed the jury that it had to acquit a particular defendant unless it found that he knowingly formed or joined a conspiracy to raise, fix, maintain, or stabilize the prices of consumer bags.

3

Despite the general import of the charge, appellants argue that one instruction in particular allowed the jury to convict them without any finding of intent whatsoever. At one point the district court charged:

Now in order to establish the offense charged in this indictment the proof need not show that the accused acted willfully or with specific intent or bad purpose either to disobey or disregard the law. The element of intent [in] the offense charged [is] established if the evidence in the case shows beyond a reasonable doubt that the act or acts of the accused were voluntarily and intentionally; that is, that they were knowingly done.

The purpose of that word "knowingly" is to insure that no one will be convicted for an act done because of mistake or inadvertence or accident or other innocent reason.

*If these acts knowingly done resulted in an agreement of the type forbidden by the Sherman Act, the law presumes that the person so acting intended that result as being the necessary and natural consequence of those acts.*

Appellants focus on the highlighted language, comparing it to the presumptions of intent condemned in *Gypsum* and in *Sandstrom v. State of Montana,* 99 S.Ct. 2450, 61 L.Ed.2d 39 (1979).

As noted earlier, in *Gypsum* the district court instructed the jury to presume, as a matter of law, that the defendants intended to act anticompetitively if that result was the "necessary and natural" consequence of exchanging prices. In *Sandstrom,* the defendant was convicted of "deliberate homicide," defined in the relevant statute as homicide committed "purposely or knowingly." The defendant had admitted to killing the victim, but contended that a personality disorder prevented him from killing her purposely or knowingly. The Supreme Court rejected, as a violation of the defendant's right to have all elements of the charge against him proven beyond a reasonable doubt, a charge that "[t]he law presumes that a person intends the ordinary consequences of his voluntary acts." *Sandstrom v. State of Montana, supra,* 99

S.Ct. at 2453. *See also United States v. Garrett,* 574 F.2d 778 (3d Cir. 1978).

In examining the instruction challenged in this case, we again note that we are dealing with charges of a conspiracy to fix prices, a per se violation of the Sherman Act. Had the highlighted portion of the instruction been delivered in another context, it might have run afoul of *Gypsum* or *Sandstrom.* The problem would stem from the meaning of the term "these acts knowingly done." If that term referred, for example, to an agreement to exchange prices, then the district court would have erred in charging the jury that it could presume criminal intent if a violation of the Sherman Act was the "necessary and natural consequence" of that agreement.

Here, however, "these acts knowingly done" refers to an agreement to fix prices. As the district court instructed almost immediately after the challenged instruction,

[a] conspiracy to fix prices, maintain prices, is unlawful even though the conspiracy may be formed or engaged in for what appeared to be the conspirators' worthy motives and agreement among the competitors, the purpose of effecting price is illegal no matter what the motive of the conspirators were [sic]. It does not matter whether their motives were good or bad or whether there were a mixture of good and bad. Therefore, you should consider only whether or not the defendants conspired or agreed to fix prices. You must disregard any questions on the reasonableness of their actions, their economic impact or good motives, as these are entirely irrelevant and immaterial to that issue.

In order to trigger the "presumption" challenged by appellants, the government had to prove that any particular defendant knowingly conspired to fix prices. Read in this context, the challenged instruction means nothing more than that a defendant is presumed to have intended to violate the Sherman Act if he joins in such a conspiracy. Perhaps a more artful, and more tra-

ditional, statement of this proposition would have been "ignorance of the law is no defense." But, unlike the charge condemned in *Sandstrom,* the challenged instruction does not relieve the government of the burden of proving any element of the crime charged. Thus, we do not believe that the district court erred in delivering such a charge in this context.

Appellants suggest that the highlighted portion of the challenged charge is susceptible of another interpretation, an interpretation that moves our inquiry outside the realm of *Gypsum.* Appellants' argument appears to be that the words "that result" refer only to "agreement," and that the highlighted instruction allows the jury to conclude that a defendant agreed to fix prices merely because his actions, viewed objectively, were consistent with the existence of such an agreement. There is a "significant difference," according to appellants, between " 'knowingly [becoming] a member of a price fixing conspiracy' and 'knowingly [doing acts which are held or construed to have] *resulted* in an agreement.' " Appellants' Joint Reply Brief at 7 (emphasis and brackets in original).

An example may clarify their apparent argument: several persons are involved in a price-fixing conspiracy whereby they meet regularly and discuss prices; if one member proposes a price increase and the others do not speak against it, they are understood by the others to have agreed to go along; a new entrant into the industry attends a meeting and innocently says nothing when a price increase is proposed; later, the new entrant adopts the price increase put into effect by the conspirators. According to the appellants' reading of the instruction, the innocent entrant could be convicted of conspiring to fix prices merely because he "knowingly" performed acts which are "construed to have resulted in an agreement."

In support of this rather strained reading, appellants cite two other portions of the charge. First, they note that the district court, at one point, defined "conspiracy" as "a setting whereby two or more persons act

or behave in a way *that causes them to be said to have agreed* that something should occur." (emphasis added). Second, they assert that the district court erroneously defined "knowing" action as action taken "voluntarily and intentionally" and not taken "because of mistake or inadvertence or accident." This definition, they assert, failed to require any criminal intent whatsoever.

In confronting these arguments, we note initially that appellants raise an issue quite different from that treated in *Gypsum*. Although both the instruction challenged in *Gypsum* and the instruction challenged here use the formula ["the law presumes that [a person intends] the necessary and natural consequences of [his] acts," under appellants' reading the challenged instruction focuses on an aspect of mens rea not considered in *Gypsum*. As already noted, *Gypsum* dealt only with the question of intent to produce anticompetitive effects, and not the more basic intent to agree. *See* 438 U.S. at 444 n.21, 98 S.Ct. 2864. Appellants' reading of the district court's instruction goes to this more basic issue: whether a particular defendant ever entered into any agreement at all.

We do not believe that "a reasonable juror could have interpreted the instruction" as appellants suggest. *See Sandstrom v. State of Montana, supra,* 99 S.Ct. 2450. First, we note that the district court's definition of the term "knowingly" was quite proper. *See* 1 E. Devitt & C. Blackmar, Federal Jury Practice and Instructions § 14.04 (1977) and cases cited therein. Appellants would have preferred a definition of "knowingly" that included a requirement of criminal purpose, but we already have rejected the notion that conviction for conspiring to fix prices requires a showing of "specific intent."

Moreover, the charge, read as a whole, precludes the possibility that any defendant could have been convicted absent a finding that he actually entered into an illegal agreement. The district court instructed, for example:

The type [of] relationship contemplated by law as a conspiracy is an offense . . . in which each member becomes the agent of every other member. To create such a relationship two or more persons must enter into a mutual agreement or understanding that they will act together for an unlawful purpose or to accomplish a lawful purpose by an illegal means. In the absence of an agreement or mutual understanding or meeting of the minds there can be no conspiracy. It is the agreement to act together for an unlawful objective that constitutes the gist of this crime.

\*　　\*　　\*　　\*　　\*　　\*

Participation in the illegal scheme is as [much] a violation of the Sherman Act as a creation and promotion of one. However, it is the Government's burden to show such participation is a matter of choice beyond a reasonable doubt. It is not enough to show only that the parties acted uniformly or similarly or in ways that may seem to be mutually beneficial. If such actions were taken independently, solely as a matter of individual business judgment without any agreement or arrangement or understanding among the parties, then there would be no conspiracy, even though the separate [and] independent actions are substantially concurrent and intended towards the accomplishment of similar objectives separately pursued by them.

\*　　\*　　\*　　\*　　\*　　\*

Now mere presence at meetings, mere presence of defendants with other defendants in and of itself is not evidence of a conspiracy. As I mentioned before, a person, in order to be named to be a member of a conspiracy, must be a knowing participant and presence without more is not sufficient participation for a person to be said to be a knowing participating conspirator.

\*　　\*　　\*　　\*　　\*　　\*

Now, silence is not agreement without a specific understanding among the alleged co-conspirators that silence will

constitute agreement or by clear evidence that the party whose silence is being considered has intended that his silence be deemed as agreement or acquiescence by him. Even if one of the co-conspirators believed at any time that he was agreeing by remaining silent, that person's understanding is not binding on anyone else. He can remain silent.

The mere presence of a defendant on an occasion when a price-fixing agreement was reached by others is not sufficient to prove that such defendant joined in the conspiracy because he may have been silent.

. . . [T]he point is silence under some narrow circumstances can be deemed to be agreement. But silence in itself can never be agreement. So before a party can be said to have agreed to something because he was silent, you must find other evidence that that party intended that his silence would be the equivalent of agreement.

You may look to events that happened after the episode to determine whether or not during that particular episode he intended his silence to be agreement. But silence should not be lightly considered as agreement. But under the proper evidentiary support it can be.

 In sum, we believe that the district court's instructions on the issue of intent were free of reversible error. Furthermore, because we have concluded that the government was not required to prove the existence of any anticompetitive effect beyond the existence of the price-fixing conspiracy itself, see *United States v. Gillen, supra,* we reject the appellants' contention that they are entitled to judgments of acquittal.

**B**

Appellants also allege that the district court's charge on the issue of withdrawal was inadequate. The district court instructed the jury:

Regarding possible withdrawal of a defendant from the conspiracy you are instructed that once it is shown to your satisfaction that a defendant knowingly joined a conspiracy he or it is presumed in law to remain a member of the conspiracy until it affirmatively appears from the evidence that the defendant in good faith disavowed and completely withdrew from any participation in the conspiracy. If you are convinced that a price fixing conspiracy as alleged by the Government did exist and that a particular defendant was a party to such conspiracy, that defendant cannot be found guilty of the offense charged if he or it effectively withdrew from the conspiracy before December 21, 1974. You may find that one or more defendants withdrew from the alleged price fixing conspiracy. The law provides that one who may have in passing been a member, been a party to a conspiracy, is not guilty if he has withdrawn from it prior to the time period covered by the charges against him.

An individual or corporation may withdraw or abandon a conspiracy by renunciation or by engaging in conduct which is inconsistent with the idea of continued participation in the alleged scheme. Mere cessation of activity in furtherance of the conspiracy is not sufficient to establish withdrawal. For a defendant to be deemed to have withdrawn there must be evidence showing withdrawal by some affirmative action. Such action must consist of a definite and decisive step of some kind which shows complete disassociation. For example, to disavow or defeat the purpose of a conspiracy or some other conduct wholly inconsistent with continued adherence to the conspiratorial objects would be the type of decisive act that a party could look to as being the basis for withdrawal.

A defendant may also withdraw from a price fixing conspiracy by notifying his alleged co-conspirators of his intent to withdraw. Such notification can consist of any communication or conduct reasonably calculated to reach the other alleged co-conspirators and proof of such communication does not require evidence that the defendant directly informed each al-

leged co-conspirator of his or its intention to withdraw.

■ Appellants do not contend that this charge misstates the applicable law in any way. Instead, they assert that it was deficient in failing to put before the jury appellants' contention that resumption of competitive activity before December 21, 1974, would constitute withdrawal from the alleged conspiracy. In particular, appellants asked the district court to add to its instruction on withdrawal the following specification:

> In this case, for instance, competitive activity is inconsistent with the idea of cooperation in the fixing of prices. If a defendant, who at first apparently cooperated with his or its competitors in the fixing of prices, resumed competitive activity by December 21, 1974, then he or it has effectively withdrawn from the conspiracy charged.

As the government points out, however, the appellants' proffered charge is misleading. The existence of some competitive activity among alleged coconspirators is not sufficient to negate the existence of an illegal conspiracy. *See, e. g., United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150, 225 n.59, 60 S.Ct. 811, 84 L.Ed. 1129 (1940); *In re Yarn Processing Patent Validity Litigation*, 541 F.2d 1127, 1136–37 (5th Cir. 1976); *Plymouth Dealers' Association v. United States*, 279 F.2d 128, 132 (9th Cir. 1960). By contrast, in *United States v. United States Gypsum Co.*, 550 F.2d 115, 130 n.15 (3d Cir. 1977), *aff'd*, 438 U.S. 422, 98 S.Ct. 52, 54 L.Ed.2d 71 (1978), the defendants requested an instruction that resumption of competitive behavior "could" constitute an effective withdrawal. Because the instruction requested in this case was imprecise, the district court was entitled to reject it. *See, e. g., United States v. American Radiator & Standard Sanitary Corp.*, *supra*, at 199.

■ Nevertheless, appellants argue that the district court's instruction that "[m]ere cessation of activity in furtherance of the conspiracy is not sufficient to establish withdrawal" prevented the jury from considering resumption of competitive activity

at all. We do not agree. The district court's statement of the law in this regard is quite correct. *See United States v. Heckman*, 479 F.2d 726, 729 (3d Cir. 1973) (quoting *United States v. Borelli*, 336 F.2d 376, 388 (2d Cir. 1964), *cert. denied*, 379 U.S. 960, 85 S.Ct. 647, 13 L.Ed.2d 555 (1965)). Moreover, we believe that withdrawal through resumption of competitive activity constitutes something more than "mere cessation of activity in furtherance of the conspiracy."

■ Finally, appellants contend that the district court erroneously refused to instruct the jury that withdrawal could be demonstrated by circumstantial evidence. They argue that because the district court specifically charged the jury that a conspiracy could be inferred from circumstantial evidence, they were entitled to "the other side of the coin," that withdrawal also could be so inferred. We note, however, that the district court gave a lengthy instruction on the use of direct and circumstantial evidence in general, and explained that the two types of evidence "have equal rank." Furthermore, the jury was instructed to "consider the circumstantial evidence and the direct evidence and the evidence that may be mixed." Given this umbrella charge, we do not believe that the district court erred in declining to specify that withdrawal could be proven by circumstantial evidence.

■ To the extent that the district court declined to elaborate on appellants' contention that resumption of competitive activity constituted an effective renunciation of the alleged conspiracy, we note that "[o]nce the judge has made an accurate and correct charge, the extent of its amplification must rest largely in his discretion." *United States v. Bayer*, 331 U.S. 532, 536, 67 S.Ct. 1394, 1396, 91 L.Ed. 1654 (1947). Under the circumstances of this case, we conclude that the district court neither misstated the applicable law nor abused its discretion.

468

## V

We have examined the appellants' other contentions[5] and find them to be without merit. The judgments of the district court as to all defendants therefore will be affirmed.

JAMES HUNTER, III, Circuit Judge, concurring:

I agree with the result reached by the majority in parts *I, II, III,* and *IV(B)–V.* Moreover, since this panel is bound by the decision of a prior panel in *United States v. Gillen,* 599 F.2d 541 (3d Cir. 1979), I concur in part IV(A) of the majority's opinion. I feel compelled, however, to note my belief that the rule of law announced in *Gillen,* and followed by the majority here, is inconsistent with the Supreme Court's holding in *United States v. United States Gypsum Co.,* 438 U.S. 422, 98 S.Ct. 2864, 57 L.Ed.2d 854 (1978). Were it not for *Gillen,* I would vote to reverse the judgments of conviction entered against each defendant, and remand for a new trial.

In view of Judge Adams' well reasoned concurring opinion in *Gillen,* a detailed critique of that case is unnecessary. Suffice it to say that *Gypsum,* as I read it, created the rule that "intent is a necessary element of a *criminal antitrust violation,*" 438 U.S. at 443, 98 S.Ct. at 2876, and held that the intent element can be satisfied only by proof that a defendant specifically intended to produce anticompetitive effects, or by proof that he knew anticompetitive effects would probably result from his conduct, coupled with evidence that such effects actually took place. Regrettably, the majority in *Gillen* chose to disregard the mandate of *Gypsum,* holding that intent as defined by *Gypsum* is not an element of all criminal antitrust violations, but rather only of those violations governed by the rule of reason. With regard to per se offenses, the majority held that "no inquiry has to be made on the issue of intent beyond proof that one joined or formed the conspiracy." 599 F.2d at 545.

Because this panel is governed by the holding in *Gillen,* I reluctantly agree with Judge Seitz and Judge Garth that the district court's charge—which instructed the jury that to find the defendants guilty of conspiracy, it must conclude that the conspiracy "was knowingly formed" and "knowingly participated in"—was not reversible error. Were this panel free, how-

---

**5.** These include (A) appellants' joint contention that the district court erred in refusing to direct the government to immunize William S. Doolan, *United States v. Herman,* 589 F.2d 1191 (3d Cir. 1978); (B) Continental's contentions that the district court abused its discretion in denying Continental's motion for a new trial under Fed.R.Crim.P. 33, that the district court erred in charging the jury on the government's burden of proving Continental's participation in the conspiracy during the felony period, that the district court erroneously admitted evidence of activities antedating the crime charged, that the district court erred in admitting the testimony and exhibits of Julius Tolton, that the district court erred in refusing to admit defense exhibit AE–204, that the district court erroneously admitted vague and imprecise accusatory testimony by government witnesses; (C) Chase Bag's contentions that the district court erred in refusing to explain Chase Bag's defense contentions to the jury, that the district court erroneously charged the jury with a sterile recitation of black letter law, that the district court erred in its charge on corporate culpability, that the district court erred in its charge on apparent authority for a corporate agent, that the district court failed to give a proper instruction on price leadership/followership, that the district court erred in denying Chase Bag's motions for severance and for a bill of particulars, that the district court erroneously limited cross-examination by Chase Bag's counsel, that the district court erred in admitting Stanley Schottland's testimony concerning his understanding of the meaning of silence at allegedly conspiratorial meetings, that the district court erred in refusing to allow Chase Bag's counsel to give the jury selected exhibits collected in "jury books," that the district court improperly restricted counsel's time for closing argument, that the district court erred in its procedure for selecting the jury; (D) Cooper's contentions that the prosecutor engaged in improper summation and rebuttal, that the district court erred in admitting the testimony of Robert Pentz, that the district court erred in denying Cooper's motion for severance, that the trial court's general management of the proceedings deprived Cooper of a fair trial; (E) Rue's contentions that the district court erred in refusing to charge the jury in a way that ensured separate consideration of the charges against Rue, and that the district court erred in refusing to take corrective action as to alleged misstatements of fact made by the prosecution.

ever, to judge the adequacy of the jury instructions under *Gypsum* rather than *Gillen*, a reversal would, in my judgment, be required. Since there was insufficient evidence introduced to enable the jury to find that the alleged conspiracy actually had anti-competitive effects, the government was obligated, under *Gypsum*, to prove that defendants possessed a specific intent to produce such an effect. The court's charge, however, plainly failed to bring this element of the offense to the jury's attention.